C. J. Langenfelder & Son, Inc., Petitioner *v.* Commonwealth of Pennsylvania, Department of Transportation, Respondent.

Commonwealth of Pennsylvania, Department of Transportation, Petitioner *v.* C. J. Langenfelder & Son, Incorporated, Respondent.

586

Argued June 5, 1979, before President Judge Bow-
man and Judges Crumlish, Jr., Wilkinson, Jr., Men-
cer, Rogers, Craig and MacPhail. Judges Blatt and
DiSalle did not participate.

*Frank A. Sinon,* with him *R. Stephen Shibla,* and *Rhoads, Sinon & Hendershot,* for petitioner.

*Stuart J. Moskovitz,* Assistant Attorney General, with him *Robert W. Cunliffe,* Deputy Attorney General, and *Edward G. Biester, Jr.,* Acting Attorney General, for respondent.

OPINION BY JUDGE ROGERS, August 7, 1979:

The Board of Arbitration of Claims after trial entered judgment in favor of C. J. Langenfelder & Son, Inc., a road builder, and against the Pennsylvania Department of Transportation in the amount of $603,049.19 with interest from December 5, 1974. Both parties have appealed.

Langenfelder and the Department (then the Department of Highways) entered into a written contract dated January 20, 1969, under which Langenfelder undertook to build 13,205 feet of highway and bridges through the Tinicum Marsh, a feeding and resting ground for migratory birds, waterfowl and wildlife located in Delaware County. The contract called for Langenfelder to complete construction within twenty-one months, but delays extended construction time by more than twenty-two months.

The first significant delay occurred as a result of objections of the United States Department of Interior and others based on alleged harmful environmental consequences of construction in Tinicum Marsh. In order to build the highway through the marsh, Langenfelder was required to remove and dispose of a large amount of sediment and replace it with granular fill capable of supporting the highway. Langenfelder planned to do this by dredging the sediment, depositing it in Tinicum Marsh on privately owned land adjacent to the highway right-of-

way and taking the necessary fill material from that land. When Langenfelder applied to the United States Army Corps of Engineers for the necessary permits to begin dredging on or about May 23, 1969, the Department of the Interior and persons and groups objected to their issuance on environmental grounds asserting that appropriate environmental planning had not been done. The normal permit issuance process was delayed while the Corps considered these objections. When the permits were finally issued on February 14, 1970 the objecting groups, including the Sierra Club and individuals, brought suit in United States District Court for the Eastern District of Pennsylvania against the Secretary of the Army and others, including Langenfelder, seeking an order invalidating the permits. A temporary restraining order halted operations for about ten days. The suit was eventually dismissed. *Stewart v. Resor*, No. 70-551 (E.D. Pa.). Langenfelder's dredging operations were delayed for seven months on account of this environmental issue.

Another cause of delay was difficulty encountered in redirecting traffic on Wanamaker Avenue, a public street crossing the highway right-of-way. The contract called for Langenfelder to build a temporary bypass street to carry Wanamaker Avenue traffic while the permanent overpass was being constructed. According to the original plans provided by the Department, the temporary street would have passed over unprotected oil pipelines, which Langenfelder and the oil companies believed could not withstand the weight of traffic. After meeting with representatives of Langenfelder and the oil companies, the Department redesigned the traffic control plans for the temporary street and directed Langenfelder to redesign the sheeting and shoring plans in order to protect the oil lines. The redesign and the additional work occa-

sioned by it caused a nine month's delay in the completion of construction on the temporary street, which in turn delayed construction of the permanent overpass and all other work dependent on its completion.

The remaining occasion of delay occurred during the pouring of the concrete deck of a bridge crossing Darby Creek. The first attempts to pour the deck were unsuccessful because the concrete hardened too fast and became unworkable. As a means of preventing this, Langenfelder recommended to the Department a change in the type of cement and the proportions of other ingredients used in the concrete. The Department approved the changes and Langenfelder poured the bridge deck after a delay of several months.

Langenfelder completed all construction on December 22, 1972. On June 7, 1974, the Department issued a Computation Certificate, showing its calculation of the amount due Langenfelder under the contract. On December 5, 1974, Langenfelder filed a statement of claim with the Board of Arbitration of Claims, seeking additional compensation for damages caused by the delays in an amount in excess of $1,-165,000 and the remission of $26,565.00, which the Department had retained as liquidated damages for the delays, for which the Department, of course, denied responsibility. After ten days of hearings on Langenfelder's claims, the Board found that all delays were attributable to the Department. The Board awarded judgment in favor of Langenfelder in the previously stated amount of $603,049.19 with interest at the rate of six percent per year from December 5, 1974. The judgment consisted of damages of $576,484.78 and return of compensation withheld in the amount of $26,-565.[1]

---

[1]The discrepancy of less than a dollar between these individual items and the total amount awarded is in the original record.

THE PENNSYLVANIA DEPARTMENT OF TRANSPORTATION'S
APPEAL

The specific items of damages awarded to Langenfelder by the Board, whose action we here uphold, are described in the Board's findings of fact 75, 76, 78, 79 and 80, following. In finding 78, the delay caused by the Corps of Engineers' refusal promptly to issue the dredging permit is called "Dredge Permit Delay", the Wanamaker road redesign is called "Revised Construction at L.R. 795", and the delay occasioned by the defects in the concrete mix is called "Achievement of Workable Concrete":

75. Langenfelder's damages, by reason of the idleness of the attendant equipment, are as follows:

(a) Rental and insurance on derrick barge "Great Eastern"          $11,576.75

(b) Rental on 'S & P3' and 'Stevie'          $36,330.00

SUBTOTAL          $47,906.75

76. Certain attendant plant to outfit the dredge Barton and required to make it operate were made idle and unavailable to Langenfelder due to the delay. The fair rental value of this attendant plant is as follows:

| Item | Monthly | Rental Period | | |
|------|---------|------|------|------|
| 5,500 l.f., 20" steel pipe | $  .50 l.f. | 7 | mos. | $19,250.00 |
| 20-20" ball joints | 50.00 | 7 | mos. | 7,000.00 |
| 77-20' dresser couplings | .70 | 7 | mos. | 377.30 |
| 29 Pontoons—5 x 20 | 50.00 | 6.75 | mos. | 9,787.50 |
| 19 Pontoons—5 x 20 | 50.00 | 5 | mos. | 4,750.00 |
| | | TOTAL | | $41,164.80 |

. . . .

78. The damages to Langenfelder by reason of the delay, induced labor escalation costs that are broken down as follows:

|  | *Labor Escalation* |
|---|---|
| Dredge Permit Delay | |
| 110 days/272.5 days = 40.4% | $ 45,800.32 |
| Revised Construction at L. R. 795 | |
| 130 Detour | |
| 142 1/2/272.5 = 52.3% | 59,291.01 |
| Achievement of Workable Concrete Mix Design | |
| 20/272.5 = 7.3% | 8,275.80 |
| | $113,367.13 |

79. Broken down by category, these extended Job Indirect Expenses are as follows:

| | | |
|---|---|---|
| (a) | Indirect labor 2/1/71-1/1/72 | $198,164.35 |
| (b) | Indirect labor 1/2/72-12/23/72 | 96,072.95 |
| (c) | Indirect plant & equipment 2/1/71-12/23/72 | 12,525.00 |
| (d) | Indirect material & invoice 2/1/71-12/23/72 | 42,815.64 |
| (e) | Special insurance—add'l cost | 3,230.00 |
| | TOTAL | $352,807.94 |

80. Home office average expenses for two (2) years is 3.825% of $555,245.98 equalling $21,838.16.

In addition to these items the Board elsewhere in its adjudication concluded that Langenfelder was entitled to the amount of $26,565 liquidated damages withheld by the Department.

This is an appropriate place for us to observe that 2 Pa. C.S. §704 requires us to "affirm the adjudication unless it shall find that the adjudication is in violation of the constitutional rights of the appellant, or is not in accordance with law . . . or that any finding

of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence.'' Under the Act of May 20, 1937, P.L. 728, governing appeals from judgments of the Board of Arbitration of Claims, in which the definition of the reviewing court's duties was stated in terms materially identical to those of 2 Pa. C.S. §704, we described our function as being that of reviewing the record to see if substantial evidence supported the Board's findings and, where we found that such support existed, to conclude that we were bound by the findings. *General State Authority v. Loffredo,* 16 Pa. Commonwealth Ct. 237, 328 A.2d 886 (1974). We did not then and do not now consider that it is our province to retry the case or to make independent factual findings and conclusions from the evidence. We have reviewed the 1700 pages of testimony and other items in this necessarily extensive record and we find substantial evidence supporting the findings just quoted. We will, however, comment briefly on the several questions presented by the Department in opposition to the damages awarded.

The Department first says that the Board lacked jurisdiction over Langenfelder's claim under Section 6 of the Act of May 20, 1937, P.L. 728, *as amended,* 72 P.S. §4651-6, which provides: ''The board shall have no power and exercise no jurisdiction over a claim asserted against the Commonwealth unless the claim shall have been filed within six months after it accrued.'' The Department says that Langenfelder's claim accrued when construction was completed on December 22, 1972 and that its claim filed on December 5, 1974 was beyond the six month limit. We disagree.

In *Allen N. Lasher, Inc. v. Department of Highways,* 1 Pa. Commonwealth Ct. 486, 275 A.2d 403 (1971), we held that the six month period of limita-

tion begins to run from the time when the injured party is first able to litigate its claim. In *Penn-Jersey Contractors, Inc. v. The General State Authority*, 12 Pa. Commonwealth Ct. 203, 315 A.2d 920 (1974), we held that the claimant there was unable to litigate its claim until it knew the full extent of its claim. Here, Langenfelder did not know the full extent of its claim or indeed whether it would be required to sue until June 7, 1974, when it received the Department's Certificate of Computation. Further, the Department's Certificate of Computation notified Langenfelder that ''no claim will be entertained by the Board of Arbitration of Claims unless such claim is presented within six months of the date of the above notification and before final payment is made.'' Langenfelder filed its claim five months and twenty-eight days after the date of the Certificate.

The Department next says that the Board erred in placing the onus of the delay in obtaining permits for dredging on the Department rather than on Langenfelder. The argument runs counter to the Board of Arbitration of Claims' findings of fact that during the planning stages of the project, the Department assured concerned citizens and environmental groups that all construction activities in Tinicum Marsh would be limited to the highway right-of-way; that the Department nevertheless approved Langenfelder's plans to deposit sediment and to borrow fill outside of the highway right-of-way; that the Department failed to inform Langenfelder of these assurances it had given to others; and that as a direct result of the Department's actions, the groups and individuals opposed Langenfelder's dredging permit applications before the Army Corps of Engineers causing delay. These findings are supported by the record. They support the conclusion that the Department breached the contract by failing to provide access to the site.

The Board of Arbitration of Claims also found that the Army Corps of Engineers held up issuing the dredging permits because the Pennsylvania Department of Highways failed to do the environmental planning required by Section 4(f) of the Federal Department of Transportation Act of 1966, *as amended,* 49 U.S.C. §1653(f). Section 4(f) provides:

> The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and *with the States* in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of lands traversed. After August 23, 1968, the Secretary shall not approve any program or project *which requires the use of any* publicly owned land from a public park, recreation area, or *wildlife and waterfowl refuge* . . . unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use. (Emphasis added.)

The Department contends that the Board erred in interpreting Section 4(f) as imposing planning requirements on the states. We disagree. The provision by necessary implication requires states to consult with the U.S. Department of Transportation in developing their transportation plans and programs. Here, the Pennsylvania Department of Highways approved a construction affecting land beyond the original scope of the project without consultation on this point with the appropriate federal authorities.

The Department also says that Section 4(f) is inapplicable because the project did not require the use of "a public park, recreation area, or wildlife and

waterfowl refuge.'' This argument is in direct conflict with the following findings of the Board which are amply supported by the record:

13. The Tinicum Wildlife Preserve is an area of national significance, having been officially designated as a registered natural landmark on March 26, 1966, under the National Historic Sites Act of 1935, 16 U.S.C.A. §461. . . .

14. The Preserve is dependent on the marsh land adjacent to L.R. 795, Section A-2 as a waterfowl feeding area. . . .

. . . .

16. The effect of construction as planned and approved by the Department of Highways, was to destroy some of the high production feeding areas of the marsh adjacent to the Preserve. . . .

17. Construction of L.R. 795, Section A-2 effected a use of publicly owned land from a public park, recreational area or wildlife or waterfowl refuge of national, state or local significance.

The Department's next argument, that the nine month delay in the construction of temporary Wanamaker Avenue was wholly attributable to problems between Langenfelder and the owners of the pipelines under the road, is also contrary to the Board's findings. The Board found that the delay was caused by the need to revamp the Department's plans for the temporary road to provide better protection for the oil companies' pipelines. While it is true that the contract required Langenfelder to cooperate with pipeline owners in protecting their property, this provision cannot be read to relieve the Department of its obligation to provide an adequate design.

The Board correctly concluded that the permit delay and the delay caused by the necessary design

changes amounted to a denial of access to the job site and that the Department was liable for damages resulting from these delays. *See Department of Highways v. S. J. Groves and Sons Company,* 20 Pa. Commonwealth Ct. 526, 343 A.2d 72 (1975).

Finally, the Department says that the Board erred in holding the Department responsible for delays caused by defects in the concrete used on the Darby Creek bridge deck. After hearing a great deal of conflicting testimony, the Board found that the concrete problem was caused by "an adverse interaction between the initial brand of cement and the other add mixtures in the mix." This original mix design or formula was developed by the concrete supplier, who was chosen by Langenfelder from a list of suppliers provided by the Department. The mix design and all the ingredients used in it were tested and approved by the Department. A Department inspector was stationed at the supplier's plant to test and approve the ingredients used in each batch. Other inspectors were stationed at the job site to inspect the concrete before it was poured. When it was suspected that the original mix design was defective, a new design could not be implemented until it was tested and approved by the Department. When the Department seeks to exert such close control over the source, the formulation and the production of material to be used in a construction project, it cannot disclaim responsibility for delays caused by a defect in that material. *See W. P. Dickerson & Son, Inc. v. Department of Transportation.* 42 Pa. Commonwealth Ct. 359, 400 A.2d 930 (1979).

In sum, we have concluded that the record supports the Board of Arbitration of Claims' findings that the several occasions of delay which increased Langenfelder's costs and expenses were the fault of the Department and breaches of its contract and that

the Board committed no error in entering judgment for Langenfelder as described.

## LANGENFELDER'S APPEAL

As we have noted, the Board gave judgment for Langenfelder in the amount of $603,049.19. Langenfelder, in its appeal, says that it was entitled to judgment in the additional amount of $586,221.28 broken down as follows:

| | |
|---|---:|
| Monthly dredge rental 7 x $53,400 | $373,800.00 |
| Insurance on dredge 7/12 x $9750 | 5,687.50 |
| Legal fee and expense incurred in third party action | 31,588.43 |
| Profit of 10% | 105,700.55 |
| Additional Home Office Expenses | 29,095.44 |
| Additional Indirect Expenses | 40,349.36 |
| TOTAL | $586,221.28 |

Langenfelder needed the use of a dredge in the prosecution of the work in Tinicum Marsh. It purchased an "Ellicott Series 3000, SUPERDRAGON" dredge for $680,651.81. The delay in the receipt of permits for dredging from the Corps of Engineers delayed the use of the dredge for seven months. Langenfelder's only evidence offered with respect to its monetary loss by the delay in the use of the dredge was that of an offer by the seller of the dredge, apparently as an alternative to the sale, to rent it to Langenfelder for $53,400 a month. This, Langenfelder says, is conclusive evidence of its monthly rental value requiring an award of seven times $53,400, $373,800. The Board rejected Langenfelder's proposal that it should be paid more than one-half of the total purchase price of the dredge on account of being deprived of its use for seven months; and so do we. The record reveals that Langenfelder still had the dredge at the time of the trial some six years after

the purchase and that the dredge has a useful life of as long as fifty years. The offer to rent the dredge, rejected by Langenfelder in favor of purchasing it, did not establish its fair rental value; and no other evidence of fair rental value was adduced. The case of *Burly Construction Corp. v. Commonwealth*, 4 Pa. Commonwealth Ct. 46, 284 A.2d 841 (1971), on which Langenfelder relies, does not support the sufficiency of Langenfelder's proof of damages on this issue. There we held that computations made by the plaintiff-contractor's engineer concerning the estimated cost of using material called for in the contract but later eliminated by the owner in favor of other materials sufficiently established the contractor's damages on account of the substitution. Here no one testified as to the fair rental value of the dredge. Analogously, in eminent domain cases, offers to buy the condemned property are inadmissible on the issue of fair value. *Saunders v. Commonwealth*, 345 Pa. 420, 29 A.2d 21 (1942).

Langenfelder proved, however, that it paid insurance premiums in the amount of $5687.50 during the period the dredge was idle. We believe that this sufficiently showed its entitlement to this item of damage. As finding of fact No. 75 shows, the Board awarded damages for insurance premiums paid with respect to other equipment idled by fault of the Department.

Langenfelder's next claim for additional expense is for attorney's fees and other litigation expenses in the amount of about $31,588.43 incurred by it in defense of the Federal District Court suit earlier mentioned attacking the dredging permits, in which Langenfelder was one of a number of defendants, others being the Secretary of Army, the U.S. Secretary of Transportation and the Pennsylvania Secretary of Transportation.

Langenfelder bases its claim on the rule stated in Restatement of Contracts, Section 334:

> If a breach of contract is the cause of litigation between the plaintiff and third parties that defendant had reason to foresee when the contract was made, the plaintiff's reasonable expenditures in such litigation are included in estimating his damages.

There appears to be no Pennsylvania appellate court case applying Section 334. It was, however, illustratively applied in *Millette v. Barrett*, 28 Pa. D. & C. 2d 372 (1962), a decision of the Court of Common Pleas of Chester County. In *Millette*, the purchasers of real property brought an action for breach of contract against the seller for falsely representing that there were no easements except for telephone and electric utility lines affecting the property. A few days after settlement, the owner of an adjacent property told the plaintiffs that an easement for a water pipeline serving his house in fact encumbered the plaintiffs' property. After the plaintiffs threatened to shut off the neighbor's water supply, they were sued in equity to restrain them from interfering with the passage of water in the pipe. The neighbor obtained the relief sought upon proving that a valid easement existed. Based on a charge to the jury which included the submission to the jury of the rule of Section 334, the plaintiffs obtained a verdict against the seller which included the amount of their counsel fees. The court en banc ruling on post-trial motions held that the use of Section 334 in charging the jury was proper. We believe that *Millette* provides a clear example of when counsel fees are recoverable under Section 334; that is, when the breach of contract caused the litigation in which the expenses incurred.

In the instant case, however, there was no causal connection shown between the Department's breaches of its contract with Langenfelder and the suit by the environmentalists to set aside the dredging permits *after they were issued*. The gravamen of the complaint in the District Court action was that the decision of the Corps of Engineers and other federal authorities to issue the permits violated Acts of Congress requiring full consideration of the environmental impact of the project. The only allegation of the complaint charging fault to the Pennsylvania Secretary of Highways was one to the effect that he failed to make ecological studies of the effects of the program and that he illegally approved the construction. The conduct of the Department which delayed the issuance of the permits had all occurred before this suit was brought. The complaint is in the record. It contains nothing whatsoever suggesting that the Department's acts of commission or omission which delayed the issuance of the permits provided any reason for the suit. Hence, the Board properly refused Langenfelder's claim for these counsel fees and expenses. We add that the suits seems to have delayed construction for perhaps ten days.

Langenfelder next says that the Board erred in not awarding him an amount equal to 10% of his claimed additional costs and expenses as profits. Having claimed costs and expenses of $1,057,005.50, it wants so-called profits of $105,700.55. Since the Board gave judgment for costs and expenses of only $576,484.78 and we agree with that determination with one minor exception, the amount claimable for this item becomes approximately $58,000.

In Pennsylvania as elsewhere, the victim of a breach of contract is entitled to recover for loss of profits caused by the breach if the evidence of such is sufficiently certain and definite to afford a basis

on which to estimate their extent. See cases cited at P.L.E. Vol. 11, Section 32. The Restatement §§329 and 331 express the rules as:

§329

Where a right of action for breach exists, compensatory damages will be given for the net amount of the losses caused and gains prevented by the defendant's breach. . . .

§331

(1) Damages are recoverable for losses caused or for profits and other gains prevented by the breach only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty.

(2) Where the evidence does not afford a sufficient basis for a direct estimation of profits, but the breach is one that prevents the use and operation of property from which profits would have been made, damages may be measured by the rental value of the property or by interest on the value of the property.

Turning to the circumstances of this case, it is important to note, first, that as Langenfelder's brief succinctly puts it, "Langenfelder earned the total profit contemplated by the contract", suffering no loss of profits anticipated when the contract was entered into; and second, as Board findings of fact numbers 75, 76 and 79(c) show, Langenfelder was given judgment totaling in excess of $92,000 in rental value of property during periods of delay caused by the Department, items which Restatement §333(2) states are allowable where the evidence does not afford a sufficient basis for a direct estimation of profits.

The Restatement §331(1) says that recovery may be had for "profits and other gains prevented by the

breach . . . to the extent that the evidence affords a sufficient basis for estimating their amount.'' Here, it is admitted that no anticipated profits were prevented by the Department's breach of contract. Here, the rental value of idled property was awarded. Langenfelder failed to prove that there were any other profits or gains prevented by the Department's breach of contract. Specifically, there is no evidence in this record of any other contract lost by reason of the extension of the time Langenfelder was required to be on this job. Had there been such and had such been sufficient to show the probability of a profit from such other available contract, we might have been put to the difficult task of deciding whether the claim presented a case of a gain prevented, for which our researches have unearthed no precedents.

Langenfelder's contention that it is entitled to what it calls profit measured by 10% of the amount of the expenses caused by the Department's breaches and here recovered, is without merit. Not only, as the Department has pointed out, is there no proof that 10% is a reasonable amount, there is no precedent that we have found supporting it. It must be kept in mind that the claims allowed are not for extra work; they were for escalation of labor costs and indirect expenses incurred by Langenfelder as the result of being on the job longer than anticipated. In no case cited by Langenfelder and in no case examined in our considerable research has the victim of delay caused by the other contracting party been held to be entitled as profits to a percentage of the damages awarded to reimburse him for his additional costs and expenses. Indeed, such a measure of profits would, in the case of a party who had in fact entered into an improvident contract, create a profit where one otherwise would not have been enjoyed.

The cases of *D'Angelo v. New York*, 41 App. Div. 2d 77, 341 N.Y.S. 2d 84, *appeal dismissed*, 300 N.E. 2d 154 (1973), and *Zook Bros. Construction Company v. Montana*, 556 P.2d 911 (1976), said by Langenfelder to be directly on point, are not. In the first case, the contractor whose performance was delayed by the State of New York did not seek damages in an amount by which its estimated costs, overhead and profit exceeded its bid; rather it sued for its actual costs together with an allowance for overhead and profit—an approach which the majority of the Appellate Division, Third Department, said was sanctioned by an earlier New York case. In the Montana case the plaintiff was held to be entitled to the profit it anticipated when it bid the job which it had lost when delays caused it to have increased costs and expenses. Langenfelder, as we have said, admits that it has received all its anticipated profits; the Board, whose judgment we substantially agree with, gave it its costs, expenses and some profits in the form of rental value of idled equipment; and its requested 10% override on these items of cost, expenses and profits is not a *profit* or *gain prevented* by the breaches of contract in this case.

Langenfelder next claims $29,095.44 for additional general and administrative expenses equal to 3.825 percent of the costs and expenses which it claimed but which the Board disallowed. Since, with the minor exception of insurance on the dredge, we have agreed with the Board on these disallowances, the claim made in this respect must otherwise be rejected.

Finally, Langenfelder says that the Board erred in not awarding $40,350 damages for items of so-called indirect plant and equipment. Reference to finding of fact 79, reproduced earlier, will show an item allowed by the Board under the heading "(c) Indirect Plant and Equipment" of $12,525. At the

trial, Langenfelder submitted an exhibit identified by a vice-president showing the following:

Item No. 5—Extension of indirect Costs

Indirect—Plant and equipment (February 1, 1971 thru December 23, 1972)

| Pickups, Broncos, | | | | |
|---|---|---|---|---|
| Corps Bus | 68.5 | Mos. at | 150.00 | 10,275 |
| Office Bldg. (32 x 24) | 22 | Mos. at | 500.00 | 11,000 |
| Office Trailers | | | | |
| (10 x 46) | 90 | Mos. at | 200.00 | 18,000 |
| Van Trailers | | | | |
| (Storage) | 51 | Mos. at | 50.00 | 2,550 |
| Grease/Fuel Truck | 9 | Mos. at | 250.00 | 2,250 |
| Shop & Warehouse | 22 | Mos. at | 400.00 | 8,800 |

INDIRECT—PLANT AND EQUIPMENT        $52,875

Langenfelder contends that the Board chose to allow from this list only the two items totalling $12,525— the pickups, etc., $10,275 and grease/fuel truck, $2,-250; and that the Board arbitrarily failed to allow the others. As will be observed, the items not allowed are an office building, trailers and a shop and warehouse. The extension in dollars claimed for each item is the product of the extra time in months Langenfelder was required to be on the job times a figure suggested as a monthly rental value. Langenfelder's witness who identified the exhibit showing these items testified, however, that the monthly dollar figure offered in each case as the fair rental value was in fact a figure recorded on Langenfelder's books as the monthly charge to be made to the job for the use of that item. On cross-examination with respect to the Shop and Warehouse for which damages of $8,800 are sought, the witness testified that the structure was built for the use on the job, that it cost $16,000 to $18,000 and that when the job was finished it was left at the site for use by a local fire company, apparently for fire fighting drills. With respect to the trailers, the witness testified that the figures for

monthly charge included charges for setting the trailer in place and for upkeep of interior furnishings. The Board might well have determined that the amounts claimed with respect to the items, other than the vehicles, lacked integrity and should be rejected. The record demonstrates to our satisfaction that this was not an abuse of the Board's discretion.

We conclude that, except for the item of insurance on the dredge in the amount of $5,687.50, (to which general and administrative expense of 3.825 percent must be added) the Board did not err in rejecting the claims which are the subject of Langenfelder's appeal to this Court.

We modify the judgment entered below in favor of Langenfelder by adding to the amount thereof, $5,687.50 for insurance on the dredge and $217.55 for general and administrative expenses thereon; and we affirm the judgment below, as so modified.

ORDER

AND Now, this 7th day of August, 1979, the judgment entered by the Board of Arbitration of Claims by order dated June 25, 1978 is modified so as to add thereto the amounts of $5,687.50 and $217.55, respectively, insurance on dredge and general and administrative expense of 3.825 percent; and as so modified, the said judgment is affirmed.