Commonwealth of Pennsylvania, Department of Community Affairs, Petitioner *v.* Craftech International, Ltd., Respondent.

Craftech International, Ltd., Petitioner *v.* Commonwealth of Pennsylvania, Department of Community Affairs, Respondent.

Argued May 7, 1982, before Judges ROGERS, MAC-PHAIL and DOYLE, sitting as a panel of three.

*Mollie A. McCurdy*, Deputy Attorney General, with her, *Susan J. Forney* and *Allen C. Warshaw*, Deputy Attorneys General, and *LeRoy S. Zimmerman*, Attorney General, for Department of Community Affairs.

*Charles J. Weiss, Timoney, Knox, Hasson & Weand*, for Craftech International, Ltd.

OPINION BY JUDGE DOYLE, February 17, 1983:

This is an appeal filed following an adjudication of the Board of Claims (Board) on a claim made by Craftech International, Ltd. (Craftech) against the Department of Community Affairs (DCA). After the Board had made an award in favor of Craftech, DCA filed a petition for review (No. 1664 C.D. 1981) arguing that the Board lacked jurisdiction to entertain Craftech's complaint. In the alternative, DCA argues that Craftech failed to sustain its burden of proof as

to damages. Craftech filed a cross petition for review (No. 1792 C.D. 1981) contending that the Board adopted an erroneous method of determining the measure of damages.

The salient facts are as follows. During the third week in June, 1972, Tropical Storm Agnes spread torrential rains across the Commonwealth. The floods which resulted therefrom caused fifty deaths, approximately one and a half billion dollars of damage to property and crops, and left over 250,000 persons homeless. Among the hardest hit were the residents of the Wyoming Valley. In an effort to alleviate the suffering of these flood victims, DCA established emergency mobile home parks. Included within these emergency parks were monolithic[1] prefabricated structures which served as community centers. Pursuant to a contract executed on October 6, 1972 with DCA, Craftech agreed to construct a maximum of fifty community centers on prepared foundations in accordance with plans approved by DCA. Although the parties never agreed as to when work on the project would begin,[2] the contract required that performance be completed within thirty days after performance did begin. In fact, work did not begin until November 27, 1972 when the first foundation became available. As a result of substantial delays, which extended through the winter of 1972-73, construction of the community centers continued until August 10, 1973 when DCA terminated the contract.

On October 15, 1974, Craftech filed a claim with the Board against DCA alleging breach of contract and seeking damages. After the pleadings had closed,

---

[1] Both DCA and Craftech use this term to describe the structures.

[2] Article XI(b) of the contract did provide, however, that DCA and Craftech would mutually agree as to when work on the project would begin.

DCA filed a motion for Summary Judgment pursuant to Pa. R.C.P. 1035, in which it argued that the Board lacked jurisdiction because Craftech had failed to file its claim within six months after its cause of action accrued as required by Section 6 of the Arbitration Act (Act), Act of May 20, 1937, P.L. 728, *as amended,* 72 P.S. §4651-6. The Board denied the motion; and, by order dated September 17, 1975, this Court dismissed DCA's interlocutory appeal by permission based on our finding that the pleadings raised issues of fact concerning the controlling question of law as to when Craftech's cause of action accrued. On June 30, 1981, following a hearing before the Board, Craftech was awarded $100,590.78 damages. This appeal followed.

Now, with the benefit of a full record, including the Board's findings of fact and conclusions of law, DCA again argues that the Board lacked jurisdiction. In pertinent part, Section 6 of the Act provides that "[t]he board shall have no power and exercise no jurisdiction over a claim asserted against the Commonwealth unless the claim shall have been filed within six months after it accrued." The jurisdictional period begins to run from the time the cause of action arose and that is when the injuried party is first able to litigate the claim. *Allen N. Lashner, Inc. v. Department of Highways,* 1 Pa. Commonwealth Ct. 486, 275 A.2d 403 (1971). A party becomes able to litigate a claim when the amount due under the claim is known. *Department of Public Welfare v. Federated Security, Inc.,* 49 Pa. Commonwealth Ct. 411, 411 A.2d 284 (1980). Furthermore, Section 6 of the Act also provides that:

[t]he claimants shall advise the department involved, in writing, of such claim, specifying the details thereof, and shall, within the same period, file with the secretary of the board a concise and specific written statement of this claim,

signed and verified by the claimant before an officer authorized to administer oaths.

A claim does not accrue until a claimant is able to prepare this detailed statement. *Penn-Jersey Contractors, Inc. v. General State Authority,* 12 Pa. Commonwealth Ct. 203, 315 A.2d 920 (1974).

In order to determine the moment when Craftech's cause of action accrued, we must review both the course of events and the conduct of the parties over a fourteen month period. On August 10, 1973, DCA sent notice to Craftech of the immediate termination of the contract. The integrated contract beween DCA and Craftech provided for termination for default (Article XVII),[3] which required thirty days notice, and termination by either party, on written notice (Article XI (c)).[4] Although DCA did not identify which termina-

---

[3] Article XVII provides as follows:

> If through any cause [Craftech] shall fail to fulfill in a timely and proper manner its obligations under this CONTRACT, or in the event of violation of any of the covenants contained herein, [DCA] shall thereupon have the right to terminate this CONTRACT by giving written notice to the applicant and specifying the effective date of termination at least thirty (30) days prior to said date. In such event all project records, unused grant monies, and such amounts as may have been expended contrary to the terms of the AGREEMENT shall be turned over to [DCA].

[4] Article XI(c) provides as follows:

> (c) On written notice by either party, this AGREEMENT may be terminated at any date prior to the expiration hereof. In such event, all finished or unfinished documents, data, surveys, studies, drawings, maps, models, photographs, and reports prepared by [Craftech] under this AGREEMENT, except material used by [Craftech] which are the property of [Craftech] upon the effective date of this AGREEMENT and materials which are developed, prepared, completed or acquired by [Craftech] shall be delivered to [DCA]. [Craftech] shall be entitled to receive payments for services performed and for expenses incurred to the date of termination.

tion clause it had invoked, it demanded that Craftech turn over to DCA all units and materials on site, as well as all project records and plans as provided by an Article XI(c) termination. In addition, DCA expressed its intention to complete the structures and to hold Craftech liable for expenses which might exceed the contract price. By letter dated August 29, 1973, Craftech acknowledged DCA's notice of termination and, pursuant to termination under Article XI(c), turned over to DCA the material and items it had demanded. Thereafter, on September 11, 1973, DCA informed Craftech that termination was not made pursuant to Article XI(c); at the same time, however, DCA accepted delivery of the structures, materials, records and documents to which it was entitled only under Article XI(c).

DCA's position was contradictory and caused great confusion in Craftech's effort to determine its rights and the extent of its claim.[5] For the purpose of clarifying the method of termination, numerous calls were made to DCA and numerous messages were left for DCA representatives to contact Craftech representatives.[6] DCA officials, however, were directed not to

---

[5] The Board's findings of fact include:

7. DCA deliberately terminated outside the provisions of the Contract without advising [Craftech] of the basis or reasons for same. [DCA] knew, or reasonably should have known, that this would create great confusion in [Craftech's] ability to determine its Claim and its legal rights and position.

. . . .

11. [Craftech] was left in a position of having to determine under which provision of the Contract DCA was terminating, causing great confusion in [Craftech's] determination of its rights and rendering [Craftech] unable to determine the full extent of its claim.

[6] The Board's fourteenth finding of fact states:

Numerous calls were made to DCA and numerous messages were left for DCA representatives to contact representatives of [Craftech] for pusposes (sic) of clarifying all the con-

respond to Craftech messages, and in fact, did not respond to any inquiry from Craftech.[7] By letter dated April 18, 1974, DCA advised Craftech of an alleged breach of structural warranties concerning the community centers, and indicated its willingness to enter into negotiations with Craftech to settle amicably. This letter resulted in a meeting between the parties in May, 1974. At that meeting, Craftech discovered that: (1) DCA would not supply any clarification regarding its method of terminating the contract; (2) Regardless of the method of termination, Craftech would not own, receive or be entitled to any of the materials, inventory and equipment at the construction sites; (3) Craftech would not receive payment for services performed and for expenses incurred to the date of termination; and (4) DCA would have no cost claim or setoff against Craftech because DCA never completed and did not intend to use the buildings. Negotiations between the parties completely broke down following a subsequent meeting held on July 15, 1974. Thereafter, on October 15, 1974, Craftech filed its complaint with the Board.

DCA argues that Craftech's claim accrued upon receipt of the August 10, 1973 notice of termination. If this is true, then the Board would not have jurisdiction over Craftech's claim, filed fourteen months later on October 15, 1974. We conclude, however, that as a result of DCA's conduct, Craftech's claim did not accrue until May, 1974. It was not until the meeting held dur-

---

fusion in [Craftech's] legal position and to clarify the situation with regard to the buildings, shells and materials at the sites, the method of termination of the contract, etc., but DCA never responded or clarified the situation.

[7] The Board's sixteenth findings of fact states: "As calls from [Craftech] to DCA continued into late 1973 and up to May, 1974, [the project coordinator for] DCA was directed by [DCA's legal counsel] not to respond to any calls or communications from representatives of [Craftech]."

ing that month that Craftech was able to either deter-
mine the value or amount of its claim, *see Federated
Securities, Inc.,* or file a concise and specific written
statement of its claim. *See Penn-Jersey Contractors,
Inc.* DCA was aware of Craftech's genuine confusion
regarding the method of termination. *At the direction
of DCA representatives,* however, Craftech's reason-
able attempts to clarify the circumstances surrounding
termination were ignored. Such affirmative conduct,
which concealed facts necessary to institute Craftech's
action, estops DCA from asserting the limitation of
action as a defense. *Schaffer v. Larzelere,* 410 Pa. 402,
189 A.2d 267 (1963); *Hauptmann v. Department of
Transportation,* 59 Pa. Commonwealth Ct. 277, 429
A.2d 1207 (1981); *Nyo v. Pennsylvania Labor Rela-
tions Board,* 53 Pa. Commonwealth Ct. 646, 419 A.2d
244 (1980); *Med-Mar, Inc. v. Dilworth,* 214 Pa. Supe-
rior Ct. 402, 257 A.2d 910 (1969). The Board's juris-
diction was proper since Craftech's complaint was
filed within six months of the May, 1974 meeting.

DCA, exercising prudent foresight, argues in the
alternative that Craftech failed to sustain its burden
of proof in measuring damages. Citing as authority
*Lichter v. Mellon-Stuart Co.,* 305 F.2d 216 (3d Cir.
1962), DCA asserts that the proper measure of dam-
ages should not include expenditures attributable to
any cause other than the breach of the other party.
Specifically, DCA argues that extra costs due to theft
and vandalism, which the Board included in damages,
were not caused by its failure to provide prepared
foundations as required by the contract. Therefore,
based on *Lichter,* DCA concludes that the Court should
reject Craftech's claim for these damages. We dis-
agree. The Board found that Craftech was ready and
able to complete performance within thirty days.[8] Due

---

[8] The Board's twenty-ninth finding of fact states: "Craftech
could and would have completed its performance under the Contract

to DCA's conduct, however, construction was frequently delayed and continued over a nine month period. It was during these periods of delay that the partially completed structures fell victim to theft and vandalism.[9] The necessary expense for replacement and repair, being a foreseeable consequence of DCA's breach which increased Craftech's actual costs, was properly included in the measure of damages. *Department of Highways v. S. J. Groves and Sons Co.*, 20 Pa. Commonwealth Ct. 526, 343 A.2d 72 (1975).

Finally, in its cross appeal, Craftech argues that the Board adopted an erroneous measure of damages. Our review reveals that while the Board adopted the proper formula to measure damages, they applied that formula improperly. In addition to being entitled to recover excess costs, *S. J. Groves and Sons Co.*, Craftech is also entitled to recover the profit anticipated under the contract. *C. J. Langenfelder & Son, Inc. v. Department of Transportation*, 44 Pa. Commonwealth Ct. 585, 404 A.2d 745 (1979). The method of determining excess cost is the difference between the contract price paid and the *actual cost* incurred by Craftech and attributable to DCA's breach. *S. J. Groves and Sons Co.* The figures necessary to determine the appropriate measure of damages are not in dispute. Upon execution of the contract, Craftech received payment of one-half the contract price, or $128,750.00. The actual cost to perform one-half of the contract was $201,238.78. The excess cost is the difference between those figures, or $72,488.78. If the contract had been completed as expected, Craftech would have made a profit

---

within thirty (30) days commencement of work if the pads had been timely and properly designed and constructed before the cold weather set in."

[9] The materials stolen from the worksite included windows, doors, lock sets and butts. Insulated ceilings, drywall, windows and doors were destroyed due to vandalism.

of $56,204.00. The correct measure of damages therefore must include lost profit as well as the excess cost, or a total of $128,692.78. In calculating lost profit, the Board included only the lost profit for the second half of the contract, or $28,102.00. The Board reasoned (theoretically) that the one-half contract price which Craftech had received included one-half of the expected profit. In fact, however, our careful review of the testimony and exhibits discloses that, *as a result of DCA's breach,* Craftech realized no profit from the $128,750.00 initial payment received upon execution of the contract.

### ORDER

Now, February 17, 1983, the judgment entered by the Board of Claims by order dated June 30, 1981 is modified so as to add thereto the amount of $28,102.00; and as so modified, the said judgment is affirmed.