Commonwealth of Pennsylvania, Department of Transportation, Petitioner *v.* Anjo Construction Company, Inc., Respondent.

Anjo Construction Company, a corporation, Petitioner *v.* Commonwealth of Pennsylvania, Department of Transportation, Respondent.

Argued November 13, 1984, before Judges ROGERS, CRAIG and PALLADINO, sitting as a panel of three.

*George D. Wenick,* Assistant Counsel, with him, *Robert H. Raymond, Jr.,* Assistant Chief Counsel, *Spencer A. Manthorpe,* Chief Counsel, and *Jay C. Waldman,* General Counsel, for petitioner/respondent, Department of Transportation.

*Robert N. Peirce,* for respondent/petitioner, Anjo Construction Company, Inc.

OPINION BY JUDGE ROGERS, February 1, 1985:

Each Anjo Construction Company, Incorporated (Anjo) and the Commonwealth Department of Transportation (DOT) has appealed from an order of the Board of Claims directing DOT to pay Anjo the sum of $25,537.00, plus interest, for material used by Anjo in making repairs to a state-owned road.

The Board of Claims made the following findings of fact which economically state the case:

(3)    On the basis of a bid it submitted, Anjo and PennDOT entered into a written contract dated April 13, 1977 for slabjacking and concrete patching to repair L.R. 1016-72-641-1023 . . . in Allegheny and Beaver Counties.

(4) Slabjacking is a procedure for raising slabs of pavement which have settled by drilling holes in them and injecting the holes with a mixture of cement concrete, sand and expansive admixture.

(5) The contract, which by its terms incorporated Form 408 specifications (1976) and Form 409 (1973), has three items in its schedule of prices which relate to the slabjacking portion of the repair project:

| Item Number | Approx. Quantity | Item | Unit Price | Amount |
|---|---|---|---|---|
| 681-002 | 581 | Holes drilled slabjacking | $30.00 | $17,430.00 |
| 681-0025 | 581 | Bags Cement Concrete-Grout | $30.00 | $17,430.00 |
| 681-0050 | 195 | Ounces Expansive Admixture | $10.00 | $ 1,950.00 |

(6) Under the terms of the contract, PennDOT agreed to pay the unit prices for each and every item set forth in the contract as compensation for the furnishing of all materials, work and labor required to complete the whole of the work to be done under the agreement.

(7) The contract contained an estimate for the quantity of admixture based on the mistaken assumption that one ounce [of admixture] would be sufficient for every three bags of cement concrete.

(8) Under the specifications, the final mix design setting for the proportion of admixture to cement concrete in the injected material was not determined until after the contract was awarded.

(9) Pursuant to §681.3 of Form 408, Anjo submitted for approval, a slabjacking mix design.

(10) On June 20, 1977, a report of the Pittsburgh Testing Laboratory relating to the concrete mix design which set forth the required amount of admixture for the slabjacking operation calling for interplast (4%) 3.8 pounds or 60.8 ounces per bag of grout was delivered to [PennDOT] and approved by the Assistant Construction Engineer, Materials Engineer and District Engineer of PennDOT.

(11) The design was prepared in accordance with the provisions of Section 681.3 of the 1976 Form 408 Specifications calling for 60.8 ounces of expansive admixture per bag of cement.

(12) Subsequently, Anjo began the slabjacking portion of the work and had drilled 18 holes, placed 42 bags of cement and furnished 2,553.6 ounces of admixture as of June 24, 1977.

. . . .

(14) As a consequence of the mix design tested by the Pittsburgh Testing Laboratory and approved in the presence of PennDOT representatives, 35,324.8 ounces of expansive admixture were necessary for completion of the work pursuant to the contract.

(15) On June 24, 1977 PennDOT, believing that the unit price of $10.00 per ounce of expansive admixture was too high and having unsuccessfully negotiated with Anjo to reduce the unit price, ordered Anjo to cease operations on the slabjacking portion of the contract work.

(16) The cost of the admixture to Anjo was $0.325/ounce.

(17) PennDOT paid Anjo for the holes drilled and the cement concrete placed at the unit price.

(18) PennDOT did not pay Anjo for the quantity of expansive admixture actually used by Anjo on the project prior to the stop work order by PennDOT.

. . . .

(21) The slabjacking portion of the contract was never completed.

(22) At the contract unit price, the cost of the admixture necessary to complete the project would have equaled $353,248.00.

(23) The original bid price for the entire contract was $158,996.45.

Although as just recorded, Anjo bid $158,996.45 to do the work and supply the materials to complete the contract, it filed a claim for loss of profits in the amount of $403,738, allegedly caused by DOT's aborting the slabjacking work; $370,678 of this amount represents the profit that it would have made by supplying the 35,324.8 ounces of admixture at $10 per ounce, which it could buy for three cents an ounce. DOT, by Answer and New Matter, averred that Anjo was not entitled to recover any profit on account of admixture either that which it supplied or that which it was prevented from supplying because it knowingly had, and knowingly would have supplied admixture in amounts grossly exceeding the amount, 195 ounces, called for in the contract without notifying DOT's Chief Highway Engineer as required by the contract.

The Board of Claims held that Anjo was not entitled to recover its anticipated profits because (1) it had breached the contract by failing to notify DOT when it discovered that 195 ounces of admixture was a gross underestimate of the amount of admixture required and (2) because, it did not comply with a provision of the contract which requires written authori-

zation for the placement of the extra material. Anjo has appealed this determination.

The Board of Claims awarded Anjo the sum of $25,537 for the 2,553.6 ounces of admixture used before DOT halted the slabjacking because DOT's representatives had on June 20, 1977, four days before it halted the work, approved the mix design calling for 60 ounces of admixture to a bag of cement. DOT has appealed from this determination.

An order of the Board of Claims will not be disturbed unless it is contrary to the law or unless the Board's findings of fact are not supported by substantial evidence. *Dick Corporation v. State Public School Building Authority,* 27 Pa. Commonwealth Ct. 498, 365 A.2d 663 (1976). It is not within the province of this court to retry the case or to make independent factual findings and conclusions from the evidence. *C.J. Langenfelder & Son, Inc. v. Department of Transportation,* 44 Pa. Commonwealth Ct. 585, 404 A.2d 745 (1979).

First, with respect to Anjo's claim for loss of profits of $403,738, we note that Section 105.04 of Form 408 Specifications, incorporated by reference in the contract, provides as follows:

Section 105.04. COORDINATION OF DRAWINGS AND SPECIFICATIONS. The contractor shall perform the work in accordance with the intent of the drawings and specifications, and shall not take advantage of any error or omission in the drawings and specifications. *In the event the contractor discovers an error or omission, he shall immediately notify the engineer.* (Emphasis supplied.)

Benito Moscatielo, the president of Anjo, testified that he knew at the time he submitted Anjo's bid that about 35,000 ounces of admixture would be necessary

to complete the slabjacking repairs and that, at the unit price of $10.00 per ounce, the cost of the admixture alone would be more than double the amount of Anjo's bid for the entire contract. On direct examination by his counsel, he testified:

Attorney Schifino:

[O]n the schedule of the prices on the contract, the bottom line figure where it says the total amount of the bid is $158,996.45, is that correct?

Benito Moscatielo:

It is correct.

Attorney Schifino:

All right, are you able to explain for the Court why you have a bottom line figure of $158,996.45 on the contract as bid and as awarded yet you have testified that just for the slabjacking portion of the job alone you should have [been] paid $388,108. Are you able to explain that for us?

Benito Moscatielo:

Yes, sir, I will. The total amount of bid of $158,996.45 is meaningless insofar as how much any project is going to end up costing. After the concrete designs have been approved and so on, what counts with PennDOT is that the approximate quantity, I repeat approximate quantity unit price prevail times what is required to use in accordance to designs of any sort.

Attorney Schifino:

When you were figuring this job and arrived at a figure that you submitted as your bid, $158,996.45, is that what you expected this job to wind up being, the total cost to PennDOT?

Benito Moscatielo:

No, sir.

Attorney Schifino:

Did you have a total cost to PennDOT in mind when you did calculate that job?

Benito Moscatielo:

Yes.

Attorney Schifino:

What was that?

Benito Moscatielo:

$550,000.

Attorney Schifino:

And how did you come to that figure?

Benito Moscatielo:

Very simple, just like I come now, 581 bags times 65 give or take a point percent, 60 to 70 ounces [of admixture] per bag.

. . . .

Attorney Schifino:

And you figure that it would take how much admixture?

Benito Moscatielo:

According to the guidelines of PennDOT, one percent of the total weight of the admixture. Of course, then it is to be determined by an independent testing laboratory that it comes to about what we figured, about $350,000, the admixture.

On cross-examination Mr. Moscatielo conceded that he did not notify DOT of the error in DOT's specifications.

Attorney Wenick:

Now since you knew before bidding that the quantity of admixture would be a great deal more than was estimated in the contract, did

you notify anybody that was a representative of PennDOT of this discrepancy prior to bidding.

Benito Moscatielo:

No sir.

Where a contractor discovers an obvious error or discrepancy in a contract, he is obliged to bring the situation to the Commonwealth's attention if he intends to subsequently resolve the issue in his own favor. *See Space Corporation v. United States,* 470 F.2d 536 (Ct. Cl. 1972).

Anjo invokes Section 102.04 of Form 408 Specifications which provides that the quantities of materials specified in the contract are merely estimates or approximations. This provision of course does not excuse Anjo from notifying DOT of a known discrepancy between the 195 ounces of admixture called for by contract and the 35,324.8 ounces required. *See J.A. and W.A. Hess, Inc. v. Hazle Township,* 9 Pa. Commonwealth Ct. 409, 413-414, 305 A.2d 404, 407 (1973), *rev'd on other grounds,* 484 Pa. 628, 400 A.2d 1277 (1979) (contract to supply "100 tons of gravel more or less" held not to impose liability for delivery of 6,000 tons). The Board of Claims, therefore, correctly concluded that Anjo is not entitled to recover profits anticipated on the supply of admixture.

DOT contests the Board of Claims' award to Anjo of $25,537 for the 2,553.6 ounces admixture at $10 an ounce which it used in slabjacking before that work was halted. DOT says that Anjo should have, but did not, obtain authorization from the Chief Highway Engineer for the use of more than the 195 ounces of admixture called for by the contract. We agree.

Paragraph six of the contract provides as follows:

It is distinctly understood and agreed that no claim for extra work or materials not specif-

ically herein provided, done or furnished by the contractor, will be allowed by the Secretary of Transportation, nor shall the contractor do any work or furnish any materials not covered by the specifications and the contract *unless such work is ordered in writing by the Chief Highway Engineer.* . . . Any such work or materials which may be done or furnished by the contractor without such written order first being given shall be at said contractor's risk, cost and expense. . . . (Emphasis supplied.)

When written orders of a designated official for extra work are required by the terms of a municipal contract, the contractor cannot recover for the extra work without compliance with the contractual provisions. *Montgomery v. Philadelphia,* 391 Pa. 607, 139 A.2d 347 (1958). Authorization by subordinates of the designated official will not constitute a waiver of the requirement of a specific written authorization. *Id.* The rationale for these rules is that they prevent fraudulent and exhorbitant claims for compensation for extra work and additional costs. 65 Am. Jur. 2d, *Public Works and Contracts,* §190.

Although *Montgomery* involved a claim for extra work, the rules applied by the court are applicable to claims for extra materials, that is, when a contract provides that no claim for extra materials will be allowed unless ordered in writing by a designated official, the contractor may not recover for the extra materials without having obtained such authorization.

Here, Anjo does not allege that the Chief Highway Engineer approved the use of the additional admixture. Indeed, its president testified that he was familiar with the procedure and forms used by DOT for authorizing the use of additional materials and that Anjo never received written authorization, other than

DOT's approval of the slabjacking mix design, to use more than 195 ounces of admixture. The approval of Anjo's slabjacking mix design by DOT's District Engineer, Assistant Construction Engineer, and Materials Engineer was not the written authorization by DOT's Chief Highway Engineer required as the basis for a claim for the use of extra materials.

We therefore reverse the Board of Claims' order insofar as it awards Anjo $25,537.00 for the supply of admixture for slabjacking; the order is otherwise affirmed.

### ORDER

AND Now, this 1st day of February, 1985, the order of the Board of Claims in the above-captioned matter is reversed insofar as it awards the Anjo Construction Company, Inc. the sum of $25,537.00; in all other respects it is affirmed.