Commonwealth of Pennsylvania, Department of Transportation, Petitioner *v.* Cumberland Construction Company, Respondent.

Cumberland Construction Company, Petitioner *v.* Commonwealth of Pennsylvania, Department of Transportation, Respondent.

Argued May 7, 1985, before Judges Rogers and
Barry and Senior Judge Barbieri, sitting as a panel
of three.

*John J. Buchy, Jr.,* Assistant Counsel, with him, *Spencer A. Manthorpe,* Chief Counsel, and *Jay Waldman,* General Counsel, for petitoner/respondent, Department of Transportation.

*Thomas A. Beckley,* with him, *Jeffrey W. Davis, Beckley & Madden,* for petitioner/respondent, Cumberland Construction Company.

OPINION BY SENIOR JUDGE BARBIERI, June 20, 1985:

This is a consolidated appeal from an order of the Board of Claims (Board) which resulted from a claim filed by Cumberland Construction Company (Cumberland) against the Pennsylvania Department of Transportation (PennDOT) for additional work it performed in connection with Contract No. 20106. Cumberland appealed from that portion of the Board's order which denied its claim for damages and additional compensation in connection with that contract. PennDOT appealed from that portion of the Board's order which awarded Cumberland additional compensation for additional work performed in connection with that contract and from that portion of the Board's order which directed PennDOT to pay over to Cumberland the sum it had previously withheld as liquidated damages. We affirm the order of the Board.

The factual background of this case may be summarized as follows. In May 1973, PennDOT advertised for bids on Contract No. 20106. This contract called for the construction of two roadside rest areas along Interstate Route 80 in Greene Township, Clinton County. The work to be performed included the construction of ramps, parking areas, buildings, sew-

age and water systems, power supplies, highway lighting and appurtenances, and some landscaping. Cumberland submitted the low bid and was awarded the contract on June 28, 1973, although the contract was not actually signed until July 10, 1973. As a result of unusual subsurface conditions, consisting primarily of quicksand and large boulders, Cumberland was required to perform additional work in order to complete the contract. Some of this additional work was performed at PennDOT's direction while other additional work was undertaken by Cumberland on its own, presumably dictated by the conditions found at the site. The existence of these unusual subsurface conditions was not known to Cumberland but was previously known to PennDOT. PennDOT did not inform Cumberland of these conditions prior to the commencement of work. PennDOT also agreed to make regular progress payments under the contract. These progress payments, however, were made irregularly and in September 1974 Cumberland experienced an acute cash-flow problem and obtained the cash necessary to complete the project from its bonding company. The bonding company subsequently sold off much of Cumberland's equipment to recover the funds it advanced to complete the project and Cumberland eventually ceased doing business as a result.

The project was completed by Cumberland on July 29, 1975 and it received PennDOT's "tentative quantities"[1] in mid-December 1975, which enabled it to calculate with some degree of specificity what it was due. Cumberland filed its complaint with the Board

---

[1] PennDOT's tentative final quantities were forwarded to Cumberland by letter dated December 11, 1975. The tentative final quantities are PennDOT's calculations of the amount of work performed under each item number under the contract multiplied by the unit price for such items to arrive at the total amount due the contractor upon completion of the project.

on January 29, 1976. Twenty-four hearings were held between September 19, 1979 and October 16, 1981. On July 5, 1983, the Board entered its final order which sustained several of Cumberland's claims and directed PennDOT to pay to Cumberland $11,500 which it had withheld as liquidated damages. The Board denied Cumberland's claim for consequential and punitive damages against PennDOT for the destruction of its business and denied the claim for additional compensation for a quantity of rock used in the performance of the contract. Both Cumberland and PennDOT appealed that order.

In its appeal, PennDOT initially contends that Cumberland's complaint was not filed with the Board in a timely manner and that the Board, therefore, was without jurisdiction to hear the claim. PennDOT also contends that the Board erred in finding that Cumberland was entitled to additional compensation for work performed under, but not specified in, the contract, and that the Board erred in directing PennDOT to pay over to Cumberland the $11,500 it had withheld as liquidated delay damages. Cumberland contends that the Board erred in denying its claim for consequential and punitive damages resulting from PennDOT's failure to make timely progress payments and in ruling that it was not entitled to the contract unit price for Selected Borrow Excavation—Special of $175 per cubic yard for additional quantities of "shot rock" or rip-rap[2] which was used to backfill the westbound parking area and under the sewage treatment plant tank pad. We shall address PennDOT's contentions first.

---

[2] Shot rock or rip-rap is defined by the Special Provisions of the contract to be hard durable rock, angular in shape and resistent to weathering of which fifty percent shall have a volume of at least one cubic foot. Shale, overburden organic and other foreign material may not be included in such material.

PennDOT's initial contention is that Cumberland failed to file its complaint with the Board within six months after the accrual of its claim as required by Section 6 of the Act of May 20, 1937, P.L. 728, *as amended,* 72 P.S. §4651-6. PennDOT argues that Cumberland's claims against it arose prior to the contract completion date of July 29, 1975 and its complaint filed with the Board on January 29, 1976 was untimely and the Board was without jurisdiction to adjudicate the claim. We disagree.

The pertinent provision of Section 6 reads as follows:

> The Board shall have no power and exercise no jurisdiction over a claim asserted against the Commonwealth unless the claim shall have been filed within six months after it accrued. The claimants [sic] shall advise the department involved, in writing, of such claim, *specifying the details thereof,* and shall within the same period, file with the secretary of the board a *concise and specific written statement of this claim. . . .*
> (Emphasis added.)

Under this section, a claim accrues when the injured party is first capable of litigating it. *C. J. Langenfelder & Son, Inc. v. Department of Transportation,* 44 Pa. Commonwealth Ct. 585, 404 A.2d 745 (1979). We have previously held that this does not occur until the injured party is capable of formulating the detailed statement of claim required by Section 6. *See Department of Public Welfare v. Federated Security, Inc.,* 49 Pa. Commonwealth Ct. 411, 411 A.2d 284 (1980).

We are also aware that the parties may agree to contractual provisions precedent to the accrual of claims under the contract. *Allen N. Lashner, Inc. v. Department of Highways,* 1 Pa. Commonwealth Ct. 486, 275 A.2d 403 (1971). The parties did so here. Section 109.09 of PennDOT's Form 408 Specifications

(1970), *as amended* and included in the contract, provided, among other things, that claims based upon "differences in measurements or errors of computation" do not accrue until the issuance by PennDOT of a final settlement certificate. This certificate was issued in December 1975 and Cumberland's complaint was filed with the Board on January 29, 1976. Cumberland also complied with the other statutory condition precedent to filing a claim specified in Section 6 of the Act quoted above, giving PennDOT notice of intent within ten days of the "inception" of its claim, contained in PennDOT's Form 408 Specifications. On the basis of the record presented before the Board, we are satisfied that Cumberland presented its claim in a timely manner and that the Board had jurisdiction to adjudicate Cumberland's claim.

We next turn to PennDOT's contention that Cumberland was not entitled to additional compensation for certain excavation work it performed which was not specified in the contract. The excavations for which the Board found Cumberland entitled to additional compensation consisted of additional work performed on the construction of the ramp and parking area for the westbound site; removal of existing curbing and sidewalk; and excavations performed at the wellhouse and pipe trenches. The Board also adjusted the unit price of the ramp and parking area excavations (Class 1 Excavation) from $1.75 per cubic yard to $4 per cubic yard and the wellhouse and pipe trench excavations (Class 4 Excavation) from $10 per cubic yard to $30 per cubic yard at the wellhouse and $70 per cubic yard at the pipe trenches. The adjustments were justified by the Board on the basis of a material change in the character and cost of the work to be performed by Cumberland at those sites.

Our review of the record satisfies us that the Board's findings in this regard are clearly supported

by substantial evidence. There was no dispute as to the existence of the unusual subsurface condition found at the site and Cumberland presented ample supporting evidence as to its increased cost in performing the work. Those increased costs were a direct result of subsurface conditions known to PennDOT but unknown to Cumberland. The Board, therefore, did not err when it awarded Cumberland additional compensation for these Class 1, Class 2 and Class 4 Excavations.

We likewise reject PennDOT's contention that it was entitled to retain $11,500 from the amount due Cumberland as liquidated delay damages. The record contains overwhelming evidence pertaining to the difficulties encountered by Cumberland as a result of the unusual subsurface conditions as well as the additional work ordered by PennDOT engineers. The unanticipated conditions as well as the additional work required Cumberland to reallocate machinery and equipment and delayed completion of the project. This Court has previously recognized that liquidated delay damages may not be retained by a party when the delay results from his own actions. *Department of Transportation v. W. P. Dickerson & Sons, Inc.*, 42 Pa. Commonwealth Ct. 359, 400 A.2d 930 (1979). The record clearly shows that any delay for which liquidated damages were assessed by PennDOT were properly attributable to extra work ordered by PennDOT and unforeseen conditions encountered at the job site for which Cumberland is not responsible and of which PennDOT was aware but failed to reveal to Cumberland. Accordingly, the Board correctly directed PennDOT to pay to Cumberland the sum it had thus improperly withheld as liquidated delay damages.

We now turn to Cumberland's initial contention that the Board erred in not awarding it compensation at the contract unit price of $175 per cubic yard for

Selected Borrow Excavation—Special for the additional quantities of "rip-rap" which it provided to complete the project. This additional "rip-rap" was placed at the sewage treatment plant to stabilize the tank pad and also to backfill the westbound ramp and parking area. Cumberland had previously accepted a price of $8 per cubic yard for this additional "rip-rap" but now contends that it is due the unit price of $175 for that additional work. We agree with the Board that the placement of additional "rip-rap" at the sewage treatment plant and the westbound ramp and parking area does not come within the work described in the portion of the contract Special Provisions which define Selected Borrow Excavation—Special. That definition restricts the use of Selected Borrow Excavation—Special to placement at the outlet ends of pipe or for embankment slope protection. This type of rock placement is highly labor intensive and requires the hand placement of the rock. This labor expense accounts for the high contract unit price of $175 per cubic yard. By comparison, the rip-rap placed at the sewage treatment plant and used to backfill the westbound ramp and parking area was merely dumped to backfill and provide a stable foundation for those areas. The only similarity between this work and the work described as Selected Borrow Excavation—Special is the type of rock used, "rip-rap." We agree with the Board that this work was intrinsically different from the work defined as Selected Borrow Excavation—Special and that the contract unit price of $175 per cubic yard was not applicable to this work. There was no error in the Board's conclusion that Cumberland was paid in full for this work by accepting the $8 per cubic yard price offered by PennDOT.

We now turn to Cumberland's final contention which is that the Board erred when it found that Cumberland was not entitled to an award of consequential

and punitive damages. Cumberland contends that it is entitled to such damages in that PennDOT's failure to make timely progress payments caused it a severe cash-flow problem which resulted in the destruction of its business. After a careful review of the record, we agree with the Board that Cumberland failed to prove that it was entitled to either consequential or punitive damages.

To prove consequential damages resulting from a breach of contract, Cumberland was required to prove that the damages it suffered were (1) such as would normally and ordinarily result from the breach, or (2) that they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3) that the damages can be proven. *Taylor v. Kaufhold*, 368 Pa. 538, 546, 84 A.2d 347, 351 (1951). The only damages which normally and ordinarily flow from the failure to timely pay money are interest. *United States v. Bethlehem Steel Corp.*, 113 F.2d 301 (3d Cir. 1940); *Ramsay v. United States*, 101 F. Supp. 353 (Ct. Cl. 1951). Also, it has been held that the destruction of a business is not a normal or ordinary result of the failure to make timely payments. *Ramsay, Id.* at 357. Additionally, our Supreme Court has held that the effect of a breach upon the business affairs of another is ordinarily not foreseeable as the parties are not expected to know the condition of each other's affairs nor take into consideration any existing or contemplated transactions. *Macchia v. Megow*, 355 Pa. 565, 50 A.2d 314 (1947).

The Board specifically found that Cumberland failed to prove that it suffered any damages as a result of the sporadic progress payments made by Penn-DOT. The Board discounted the testimony of Cumberland's chief witness on this issue, characterizing him as a "professional witness" who was hired specifically to refute testimony offered by PennDOT. Of

course, evaluation of witness credibility and assignment of evidentiary weight are proper functions of the Board and not an appellate court. *Chapman v. Pennsylvania Board of Probation and Parole,* 86 Pa. Commonwealth Ct. 49, 484 A.2d 413 (1984). The record also contains substantial evidence to support the Board's conclusion that Cumberland's demise was caused by its own irresponsible financial practices rather than any delay in making progress payments caused by PennDOT. Therefore, Cumberland's claim for consequential damages was properly rejected.

Considering now the second prong of Cumberland's final contention which deals with its claim for punitive damages against PennDOT, we note that to be entitled to an award of punitive damages in a contract case, Cumberland must show that the actions of which it complains also constitute a tort for which punitive damages are recoverable. Restatement (Second) of Contracts, §355 (1965). Cumberland alleges that PennDOT committed the tort of interference with its business affairs which is a recognized cause of action in Pennsylvania. *See Sachs v. Continental Oil Company,* 454 F. Supp. 614 (E.D. Pa. 1978). One of the elements necessary to prove this cause of action is that the defendant has acted purposely to cause a specific type of harm to the plaintiff. *Sachs, Id.* at 620. Here, Cumberland presented absolutely no evidence to show that PennDOT deliberately delayed progress payments for the purpose of forcing it out of business. As noted earlier, Cumberland also failed to prove that the destruction of its business was caused by PennDOT's failure to make regular and timely progress payments. The Board correctly denied Cumberland's claim for punitive damages.

Having found the Board's findings to be supported by substantial evidence and no errors of law committed, we must, therefore, affirm the Board's order.

ORDER

AND Now, this 20th day of June, 1985, the order of the Board of Claims at Docket No. 458, dated July 5, 1983, is hereby affirmed.