Commonwealth of Pennsylvania, Department of Transportation, Petitioner *v.* W. P. Dickerson & Son, Inc. and Dickerson Enterprises, Inc., a Joint Venture, Respondents.

Argued March 5, 1979, before Judges CRUMLISH, JR., ROGERS and MacPHAIL, sitting as a panel of three.

*Arthur H. Marateck,* Assistant Attorney General, with him *Robert W. Cunliffe,* Deputy Attorney General, for appellant.

*Bert R. Oastler,* with him *Smith, Currie & Hancock; Edward C. First;* and *McNees, Wallace & Nurick,* for appellees.

OPINION BY JUDGE ROGERS, May 1, 1979:

This is the appeal of the Department of Transportation (PennDOT) from two judgments rendered by the Board of Arbitration of Claims in favor of W. P. Dickerson & Son, Inc. and Dickerson Enterprises, Inc. (Dickerson) and against PennDOT in the amounts, respectively, of $120,830.98 with interest from October 31, 1969 and $47,618.85 with interest from June 1, 1970.

On December 12, 1967 Dickerson and PennDOT entered into a written contract for the construction by the former of 5,500 feet of highway and necessary bridges in Crawford County. The most significant element of the contract was the construction of a pair of multi-span bridges across what is known as the Con-

neaut Swamp. The construction of these bridges entailed the manufacture, transportation and erection of 600 prestressed concrete box beams for the support of the concrete decks. All except 115 of these beams were manufactured by the Dickerson Structural Concrete Corporation, a company owned by W. Logan Dickerson, the owner of W. P. Dickerson & Son, Inc. and Dickerson Enterprises, Inc. PennDOT provided the specifications for the manufacture of the beams, including the materials to be used therein, and maintained an inspection team at Dickerson.'s plant during the process. All construction was originally to be completed within 230 working days but this was later extended to 299 days because of another contractor's delay in putting in place a surcharge, a fill material designed to stabilize the soil on the approach to the bridges. According to the plans, the surcharge was to remain in place for two years and it is clear that Dickerson could not complete its construction until the surcharge was removed.

Dickerson delivered the concrete box beams to the construction site and began placing them in late summer of 1968. By April, 1969, many of the beams were in place and portions of the deck were completed. On April 22, 1969 PennDOT notified Dickerson that three of the beams on the bridge were rejected because of top cracking. PennDOT inspected the other beams and by June 12, 1969 had rejected a total of thirty-seven of them for top cracks. All of the rejected beams had been manufactured at Dickerson's plant. Because of the rejections, Dickerson was forced to remove the beams or to shift them to areas of the bridge where decking had not yet begun. This caused a major disruption in the construction schedule. On July 18, 1969, after analyzing core samples of the top cracked beams, PennDOT accepted all but one of the beams as being satisfactory. The one that was not accepted was re-

jected because of insufficient top slab thickness. Penn-DOT also inspected beams still at Dickerson's plant and rejected thirteen of those because of side craking.

On August 5, 1969 PennDOT approved a partial removal of the surcharge and the remainder was removed on April 30, 1970.

Dickerson completed the project on October 13, 1970 in a total of 340½ working days, instead of the 299 working days specified as extended. PennDOT, relying on the liquidated damages clause of the contract, withheld from Dickerson $420 for each day over the 299 days provided for completion, or a sum of $17,-430.00.

Dickerson filed a complaint in assumpsit with the Board of Arbitration and Claims seeking remission of the liquidated damages and requesting damages for the delay caused by PennDOT's rejection and inspection of the prestressed concrete beams. After twenty-nine days of hearings, the Board gave judgment for Dickerson in the amount of $120,830.98 with interest from October 31, 1969 for damages relating to Penn-DOT's rejection of the beams and an additional $47,-618.85 with interest from June 1, 1970 for corporate and job overhead and the retention of liquidated damages.

PennDOT says that it is not liable for the expenses incurred by Dickerson as a result of the rejection and later acceptance of beams because it did not act arbitrarily or capriciously in rejecting the beams and because Dickerson was responsible for the defects which led to the rejections. This argument turns on whether PennDOT provided the design specifications for the beams and whether Dickerson complied with the specifications.

It is well established that a contractor who performs according to detailed plans and specifications is not responsible for defects in the result. *Canuso v.*

*Philadelphia,* 326 Pa. 302, 192 A. 133 (1937) ; *Filbert v. Philadelphia,* 181 Pa. 530, 37 A. 545 (1897). PennDOT says that it did not provide detailed design specifications or, alternatively, that Dickerson did not strictly comply with the specifications which were provided. The Board disagreed with both of these contentions and its conclusions are supported by substantial evidence. PennDOT provided Dickerson with specifications relating to all materials to be used in the construction of the prestressed concrete beams. The specifications dictated the composition and the procedure for mixing the concrete and described the tests to be run on each batch. They also prescribed the conditions under which the beams could be poured and cured. A team of PennDOT inspectors monitored the pouring of the concrete and the formation of the beams. The inspectors had the authority to stop the operation at any stage. Dickerson was permitted to choose certain equipment and procedures for the construction of the beams but these were subject to approval by PennDOT. In short, Dickerson exercised little if any independent discretion in the constructing of the beams.

PennDOT's alternative argument is that Dickerson did not follow specifications in pouring and curing the beams and that these deviations caused the side cracks which led to PennDOT's rejection of the beams. After hearing much conflicting testimony, the Board concluded:

9. All the beams were constructed in accordance with the Contract document.

This conclusion is clearly supported by the record. PennDOT inspectors supervised each step of the operation. An expert witness who reviewed Dickerson's pouring and curing charts testified that the work conformed to specifications. An employee of Dickerson, called as a witness by PennDOT, testified that he was in charge of the curing process and that it was done

according to the specifications. Further, there was expert testimony that the cracks were caused by the type of cement prescribed and tested by PennDOT rather than by any procedure employed by Dickerson.

It is unnecessary to decide whether PennDOT's rejection of the cracked beams was arbitrary and capricious. Dickerson followed PennDOT's specifications and any delay in construction caused by apparent defects was attributable solely to PennDOT even if the rejection was made in good faith. Since Dickerson fully satisfied its obligation by constructing the beams according to specifications, it was entitled to additional compensation for the extra work and expenses involved in shifting or removing the beams from the bridge and testing them. *See Miller & Sons Co. v. Homeopathic Medical & Surgical Hospital & Dispensary of Pittsburgh*, 243 Pa. 502, 90 A. 394 (1914).

PennDOT's final argument is that Dickerson is not entitled to a remission of the liquidated damages because Dickerson failed to complete construction within the time allotted in the contract. We disagree. There is uncontradicted testimony that Dickerson could not begin grading and draining the construction site until after the removal of the surcharge material by another contractor. In December 1967 PennDOT provided Dickerson with a "distribution of working time" chart, which estimated that Dickerson would need 105 working days after grading had begun to complete the remaining construction. The project was in fact completed in 71½ days after the surcharge was removed on April 30, 1970.

Further, Dickerson was prevented from completing the contract within 299 days by the disruption in its work schedule caused by PennDOT's rejection of the cracked beams. Since Dickerson followed PennDOT's specifications in manufacturing the beams, the cracks and the resulting delays were wholly attributable to

PennDOT. Where one party to a contract is the cause of another's failure to perform, it cannot assert that failure against the other. *Department of Property & Supplies v. Berger,* 11 Pa. Commonwealth Ct. 332, 312 A.2d 100 (1973). It is particularly well settled that a party may not retain liquidated damages for the amount of delay caused by its own actions. *Pittsburgh Iron & Steel Engineering Co. v. National Tube Works Co.,* 184 Pa. 251, 39 A. 76 (1898).

Judgments affirmed.

### ORDER

AND Now, this 1st day of May, 1979, the judgments of the Board of Arbitration of Claims appealed from herein are affirmed.