**STABLER CONSTRUCTION, INC. on its own behalf and on behalf of Bear Creek Construction, Inc. and Bear Creek Construction, Inc., on its own behalf, Petitioners,**

v.

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF TRANSPORTATION, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Feb. 4, 1997.

Decided April 21, 1997.

Kevin B. Watson, King of Prussia, for petitioners.

Stephen S. Stokwitz, Harrisburg, for respondent.

Before SMITH and FLAHERTY, JJ., and MIRARCHI, Jr., Senior Judge.

FLAHERTY, Judge.

Stabler Construction, Inc. (Stabler), on its own behalf and on behalf of Bear Creek Construction, Inc. (Bear Creek), petitions for review of an order from the Board of Claims (Board) denying Petitioner's claim against the Pennsylvania Department of Transportation (DOT) for breach of a bridge rehabilitation contract (Contract). We affirm.

After competitive bidding which opened on February 5, 1990, DOT awarded the bridge rehabilitation Contract to Stabler. The Contract required the three-phase removal and replacement of an existing concrete bridge deck and integrated steel of the bridge structure which carries I-83 over the Paxton Creek in Harrisburg. The Contract incorporated DOT's standard specifications and DOT's "Publication 408" Specifications (Specifications). After contracting with DOT to perform the bridge rehabilitation, Stabler entered into a subcontract with Bear Creek for the bridge deck work. Bear Creek purchased the concrete used for the bridge decking from the Pennsy Supply Company (Pennsy), a DOT approved vendor of concrete.

Section 704, Table A of the Contract Specifications established minimum design and compressive strengths of the concrete required for all three phases of the project. The Contract Specifications required class AAA concrete which was required to achieve a compressive strength of 3,600 PSI after seven (7) days of curing and 4,500 PSI after twenty-eight (28) days of curing. (R.R. 221a). The concrete compressive strength was to be determined by testing various concrete test cylinders. DOT was responsible for conducting the tests, and its results were binding. DOT established the specifications for the materials and the procedures for achieving the required design mix of the concrete. Additionally, DOT inspected the formulation and manufacture of the concrete used in the instant case.

After seven (7) days of curing, the concrete in the test cylinders from the Phase–II pour failed to meet the required compressive strength. The concrete also failed to meet the required compressive strength for testing at twenty-eight (28) days. Consequently, DOT ordered Bear Creek to remove and replace the concrete that it poured to form the bridge decking. The Phase II re-pour and the Phase III pour also failed to meet the required compressive strengths. However, rather than requiring Bear Creek to replace this concrete, DOT charged only penalties against Bear Creek because the compressive strength of those subsequent pours was high enough to safely support commuter traffic. Stabler sued DOT to recover these additional costs.

■ Stabler raises several issues for our review.[1] Stabler argues that the Board erred as a matter of law by concluding that the Contract Specifications placed the responsibility of properly protecting and curing the concrete on Bear Creek. Stabler specifically contends that, pursuant to our decision in *Department of Transportation v. W.P. Dickerson & Son, Inc.*, 42 Pa.Cmwlth. 359, 400 A.2d 930 (1979), when DOT exercises extraordinary control over the development, production, and application of construction material, the contractor is not responsible for any failure in the material once it has been established that the contractor complied with contract specifications.

In *Dickerson*, under the constant supervision of a DOT inspection team, Dickerson manufactured several hundred prefabricated, prestressed concrete box beams according to DOT's design specifications. After DOT rejected several beams for cracking, Dickerson failed to meet the contract deadline. Consequently, DOT withheld a substantial part of the payment. *Dickerson*, 400 A.2d at 931. In determining that Dickerson was not responsible for penalties, this court stated that "[i]t is well established that a contractor who performs according to detailed plans and specifications is not responsible for defects in the result." *Id.* 400 A.2d at 932. We recognized that Dickerson exercised little, if any, discretion and complied with all specifications for materials and procedures which were monitored by inspectors with the authority to stop operations at any time. *Id.* We held that Dickerson fully satisfied his obligation under the contract by constructing the beams according to specifications, and Dickerson was not responsible for delays that resulted from the cracked beams. *Id.*

The case *sub judice* is distinguishable from *Dickerson*. Here, the Board specifically found that the Specifications were incorporated into the Contract. (Finding No. 12). Section 704 of these Specifications provides procedures for concrete mixing and the required tests for measuring compressive strengths at seven (7) and twenty-eight (28) days of curing for various types of concrete.

(Findings of Fact 13–15). DOT testing concluded that the concrete from the first and second Phase–II pour and the Phase–III pour failed to meet minimum compressive strength requirements.

Moreover, section 105.11 of the incorporated Specifications states that the "presence of the inspector during the performance of any work on the project will not relieve the Contractor of the responsibility for work that is later determined by the Engineer to be defective." (R.R. 208a). Additionally, section 107.16, entitled "Contractor's Responsibility for Work," provides that the contractor must repair, remove, or restore any damage or latent defects at no expense to DOT. This language expressly places the legal obligation on the contractor to ensure compliance with all procedural specifications regardless of the presence of DOT inspectors and renders our holding in *Dickerson* inapplicable to the case *sub judice*.

Determining rights and obligations under a contract depends on the contract provisions in the specific case. Sections 105.11 and 107.16 are part of a 1987 version of the Specifications which post-dates the *Dickerson* case. The *Dickerson* court did not mention any contractual language that expressly placed all responsibility on the contractor regardless of the presence of inspectors. Therefore, as found by the Board, the responsibility for meeting the procedural specifications pertaining to the proper protection, transportation, and maintenance of the bridge concrete remained on Bear Creek until DOT accepted the work under the express terms of the Contract. (Finding No. 24).

■ Additionally, the Board did not base its decision on the quality of the mix design or Specifications, both of which were controlled by DOT. Rather the basis for the Board's decision was Bear Creek's failure to meet procedural specifications through improper maintenance and curing of the concrete. Procedural specifications are as important to the quality of the resulting

---

1. Our review in appeals from the Board of Claims is limited to determining whether constitutional rights were violated, whether an error of law was committed, and whether necessary findings of fact are supported by substantial evidence. *Phillips v. Department of Environmental Resources*, 133 Pa.Cmwlth. 598, 577 A.2d 935, 937 (1990).

product as the material specifications. The failure to properly follow procedures resulted in Bear Creek's failure to comply with the Specifications for compressive strength and perform its obligations under the Contract. In a project such as the one in the case *sub judice*, DOT cannot, as a practical matter, maintain constant supervision of the bridge construction operations. DOT cannot be responsible for defects in the cured concrete when a contractor's negligence during periods between inspections caused such deficiencies. In this regard, the Board found that Bear Creek failed to adequately maintain the required temperatures for curing the concrete and provide for a proper level of hydration by allowing burlap wraps to dry out. Therefore, even if we were to apply our holding in *Dickerson* to the instant case, Stabler fails to establish that it meets the most important element of that holding, i.e. Stabler failed to establish that it complied with all applicable material and procedural specifications.

Stabler also argues that the decision of the United States Supreme Court in *United States v. Spearin*, 248 U.S. 132, 54 Ct.Cl. 187, 39 S.Ct. 59, 63 L.Ed. 166 (1918), precludes the Board's decision. We disagree.

In *Spearin*, a builder contracted with the Navy Department to construct a dry dock at Brooklyn Navy Yard which, according to plans and specifications supplied by the federal government, included the relocation of a sewer before the dry dock construction. However, unbeknownst to the government or Spearin, there was a dam inside the old sewer. After a heavy rain, the dam caused a back up of water pressure breaking the relocated sewer pipe and flooding the excavation for the dry dock. Spearin refused to resume work until the government assumed responsibility for the damage. The Court held that the government impliedly warranted the condition of the sewer, and the contract provisions making Spearin responsible for inspecting the plans and the property did not obligate him to investigate the history of the locality to determine whether the government's sewer design proved adequate.

We first note that *Spearin* involved a contract with an agency of the federal government, and the *Spearin* Court determined the rights and obligations of the parties to that contract by applying federal law. The instant case does not involve or require the application of federal law. Therefore, *Spearin* is not binding on this court. Additionally, the *Spearin* decision is not persuasive authority because it is factually distinguishable from the instant case. In *Spearin*, the government specifications constituted a faulty design given the site conditions of the dry dock and, although the contract placed the obligation on Spearin to examine the site, the dam in the old sewer system was beyond any reasonable inspection. Because no one could objectively perform under the contract after the flood, the doctrine of impossibility excused Spearin's continued performance.

In the instant case, DOT's contract with Stabler placed the responsibility for meeting minimum concrete design strengths on the contractor. Reasonable diligence and inspection on the part of Bear Creek, a professional builder, would have produced the desired design results. Stabler was not confronted with faulty design specifications as a result of an unknown condition that interfered with its performance, which was the case in *Spearin*.

Therefore, the Board did not commit legal error because the parties voluntarily agreed to section 105.11 of the Contract Specifications, which expressly provided that DOT disclaimed any warranty or responsibility for deficient work results in the construction project, and the parties also agreed to section 107.16 which specifically obligated Stabler and Bear Creek to repair defects and sustain the liability for deficient performance.

Additionally, Stabler argues that the evidence establishes that the concrete was not deficient in strength. In this regard, Stabler argues that independent lab results show that the concrete satisfies the minimum compressive strength requirement of DOT's design mix. We, however, find this argument to be without merit for several reasons.

In our appellate role, making findings of fact or reweighing the evidence is beyond our scope of review. *Fitzpatrick v. Unemployment Compensation Board of Review*, 150 Pa.Cmwlth. 591, 616 A.2d 110, 111

(1992). Stabler's argument asks us to re-weigh the evidence and find that the concrete in the instant matter was not defective. Although competent evidence may exist to support another finding, we cannot reverse the Board unless the Board's findings are unsupported by substantial evidence. *Feinberg v. Unemployment Compensation Board of Review,* 160 Pa.Cmwlth. 524, 635 A.2d 682, 684 (1993). As long as these findings are supported by substantial evidence, they are conclusive on appeal. *Id.* Substantial evidence is the existence of relevant evidence that a reasonable person might accept to support a finding, after reviewing the record as a whole in the light most favorable to the prevailing party. *Id.*

Here, the Board found that Pennsylvania Testing Method (PTM) 611, included in the instant Contract, mandates that test cylinders are to be field cured and not lab cured. (Finding No. 38). Under PTM–611, all test cylinders must be stored at temperatures between sixty (60) and eighty (80) degrees during the first twenty-four (24) hours. (Finding No. 39). Additionally, determining the compressive strength of the test cylinders was the sole method for determining the strength of the bridge deck. (Finding No. 46). These findings are based on express contractual provisions and are, therefore, supported by substantial evidence.

The Board also found that the test cylinders used by Stabler for independent analysis were lab cured and not field cured, a violation of the Contract. (Finding Nos. 47–53). These lab cured cylinders were also allowed to cure for more than twenty-eight (28) days, also a violation of the Contract. Additionally, although the Contract required Stabler and Bear Creek to maintain the field cured test cylinders in accordance with the Specifications, Bear Creek failed to properly maintain and control temperatures in accordance with the Contract Specifications. The Board found that temperatures reached as high as ninety-two (92) degrees during the curing of the bridge deck. (Finding No. 40).

There is also evidence that concrete temperatures reached as high as 180 degrees. (R.R. 181–183). High temperatures could rapidly dry out the concrete while it is curing and thereby decrease the compressive strength. The Board also found that Pennsy employees observed dry burlap wrapping and dehydrated concrete cylinders on the decking. (Finding No. 43).

Under the contract, the only testing that governed whether concrete was deficient in strength was testing performed by DOT, and independent lab analysis proffered by Stabler, was irrelevant. (R.R. 210a). DOT's test results confirmed that the concrete failed to meet the specifications for the minimum design strength after the seven (7) and twenty-eight (28) days of curing. Our review of the record reveals that there is substantial evidence to support the Board's findings that Bear Creek failed to perform its contractual obligations and, as a result, the concrete failed to meet minimum compressive strengths as requirements.

We, therefore, hold that the Board properly concluded that Bear Creek is responsible for costs associated with re-excavating and repairing the concrete decking on the bridge and the penalties assessed against it for deficient concrete strength in subsequent pours. The Contract and the incorporated Specifications expressly provided that the contractor was financially responsible and contractually obligated to make repairs for defective concrete, regardless of the presence of inspectors. At the very least, Stabler was obligated to meet the minimum obligations expressly defined in the Contract.[2]

Accordingly, the order of the Board is affirmed.

### ORDER

AND NOW, this 21st day of April, 1997, the order of the Board of Claims, dated June 7, 1996, at No. 1646, denying the claim of

---

2. Stabler also argues that the Board erroneously considered hearsay statements from Pennsy employees that Pennsy added water to the concrete mix thereby decreasing the compressive strength of the concrete. However, we need not address this argument because, even without this evidence, there is a substantial basis for the Board's conclusion that Stabler is responsible for the deficiencies in the compressive strength of the concrete.

Stabler Construction, Inc. and Bear Creek Construction, Inc. against the Department of Transportation, is hereby affirmed.