112 F.3d 695
 RHONE POULENC RORER PHARMACEUTICALS INC.; Turner
Construction Co., Appellants,
v.
NEWMAN GLASS WORKS; Employers Insurance Of Wausau, Appellees,
v.
SPECTRUM GLASS PRODUCTS, INC.; Interpane Coatings, Inc.;
Interpane Acquisition Co.; CUH2A Architects,
Engineers, Planners.
 No. 95-2022.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 3, 1996.
Decided May 5, 1997.
Sur Petition for Rehearing June 4, 1997.
 
 Joyce K. Hackenbrach (Argued), Charles E. Harris, Pepper, Hamilton & Scheetz, Philadelphia, Pennsylvania, for Appellants.
 A. Christopher Young (Argued), Piper & Marbury, L.L.P., Philadelphia, Pennsylvania, for Appellees.
 Before: ALITO, McKEE and SEITZ, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Circuit Judge.
 
 
 1
 Plaintiff Turner Construction Company ("Plaintiff") appeals from an order of the district court granting Defendant Newman Glass Works' ("Defendant") motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b). The district court exercised diversity jurisdiction. We have jurisdiction under 28 U.S.C. § 1291. The parties agree that Pennsylvania law governs this matter.
 
 I.
 
 2
 Rhone Poulenc Rorer, Inc. ("Rhone") contracted with Plaintiff to have Plaintiff install opaque spandrel glass in Rhone's headquarters and research facility. In turn, Plaintiff, as the general contractor, entered into two subcontracts with Defendant, which required Defendant to supply and to install the opaque spandrel glass that comprised the structure's curtainwall. The subcontracts, which are identical as relevant here, specify the type of glass Defendant was to install and list the three manufacturers from whom Defendant could purchase the glass. The subcontracts' specification for the glass reads:
 
 
 3
 d. Spandrel Glass
 
 
 4
 (a) Type 8: 1/4 inch thick heat strengthened float glass coated on the face with opaque colored ceramic coating or black polyethylene opacifier on the rear surface.
 
 
 5
 (Pl.'s Ex. 34A, R. at A801.) For each manufacturer, the subcontracts specify a product identification number, the color, and the type of glass to be purchased.
 
 
 6
 In compliance with the foregoing terms, Defendant set about installing the specified spandrel glass that it had purchased from Spectrum Glass Products, Inc. ("Spectrum"), one of the three listed manufacturers. Spectrum had attached the opacifier coating, a polyethylene film, to the glass with a glue that product literature stated normally could be expected to perform in temperatures exceeding 180 degrees Fahrenheit. The glass was exposed to such temperatures after installation.
 
 
 7
 Before Defendant completed the installation, the opacifier coating began to delaminate from portions of the glass. Plaintiff and its architect noticed the delamination because portions of the installed glass exhibited a mottled appearance. Plaintiff demanded in writing that Defendant replace the defective glass. Defendant refused, and Plaintiff instituted this action for breach of contract.
 
 
 8
 At the close of evidence at the trial, the district court denied both parties' motions for judgment as a matter of law. The jury then awarded Plaintiff damages of $225,691.15.
 
 
 9
 The district court thereafter granted Defendant's renewed motion for judgment as a matter of law without addressing the import of the Defendant's express warranties against defective materials. The district court held that Defendant complied with the subcontracts' specifications in purchasing and installing the opaque spandrel glass, and that the jury therefore could not reasonably find Defendant in breach. The court entered judgment for Defendant on its counterclaim for $111,668.00, the balance owed under the subcontracts. Plaintiff appealed.
 
 II.
 
 10
 Our review of the district court's order granting judgment as a matter of law for Defendant is plenary. See Mosley v. Wilson, 102 F.3d 85, 89 (3d Cir.1996); Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 613 (3d Cir.1995). Defendant is entitled to judgment as a matter of law if after Plaintiff was heard fully, "there is no legally sufficient evidentiary basis for a reasonable jury to find for" Plaintiff. Fed.R.Civ.P. 50(a).
 
 III.
 
 11
 We commence our analysis on this appeal by focusing our attention on the warranty provisions of the subcontracts. Section X of the subcontracts requires Defendant to remove and to replace all materials that Plaintiff or its architect "condemn as unsound, defective or improper."[1] In Section 4.5.1 of the general contract, Plaintiff expressly warrants to Rhone that all work will be "free from faults and defects."[2] Defendant, in turn, assumes this warranty toward Plaintiff in the subcontracts.[3]
 
 
 12
 Defendant argues that these express warranties are legally insufficient to support the jury's verdict because these warranties are nullified by Plaintiff's implied warranty that the specified glass was adequate for use in this building. Defendant asserts that under the Supreme Court's 1918 decision in United States v. Spearin, 248 U.S. 132, 54 Ct.Cl. 187, 39 S.Ct. 59, 63 L.Ed. 166 (1918), and its progeny, it cannot be held liable for any defects in the glass because it complied with the specifications in the subcontracts.
 
 
 13
 In Spearin, the Court held that a contractor is not liable for the consequences of defects in specifications provided by the owner. Id. at 136, 39 S.Ct. at 61. The Court explained that by prescribing the character, dimensions and location of the work to be done, the owner "imported a warranty that, if the specifications were complied with, the [work] would be adequate." Id. at 137, 39 S.Ct. at 61. This implied warranty, the Court noted, is not overcome by general clauses requiring the contractor to visit the site, review plans, or to assume responsibility for the work until completion and acceptance. Id. Pennsylvania law is in accord. Pennsylvania Dep't of Transp. v. W.P. Dickerson & Son, Inc., 42 Pa.Cmwlth. 359, 400 A.2d 930, 932 (1979).
 
 
 14
 We need not predict how the Pennsylvania Supreme Court might define the contours of the implied warranty of specification, however. Assuming arguendo, that the implied warranty of specification normally would absolve Defendant of liability for the defective glass, we are presented here with a conflict between the implied and the express warranties. We conclude that the Pennsylvania Supreme Court would find that the express warranties must prevail.
 
 
 15
 Implied warranties are generally not favored by law and are construed narrowly. See, e.g., Green Constr. Co. v. Kansas Power & Light Co., 717 F.Supp. 738, 742 (D.Kan.1989). This warranty of specification permits a court to allocate the risk of an inadequate specification, quite equitably, to the party that drafted the specification.[4] Here, though, the parties have explicitly allocated to Defendant the risk that the glass would be defective. The parties are free to do so, and there is no indication of overreaching or bad faith by Plaintiff. Cf. PBS Coals, Inc. v. Burnham Coal Co., 384 Pa.Super. 323, 558 A.2d 562, 564 (1989) (holding that implied warranties attendant to the sale of goods may be disclaimed if the purchaser reasonably should know of resultant potential liabilities).
 
 
 16
 Defendant accurately notes that Spearin provides that an implied warranty of specification is not overcome by "general clauses" requiring a contractor to visit a site or to review plans. Spearin, 248 U.S. at 136, 39 S.Ct. at 61. The express warranties in the subcontracts here, however, are not the sort of general clauses about which Spearin speaks. Section X of the subcontracts very specifically requires Defendant to remove and to replace any materials that Plaintiff or its architect deem defective. Through the incorporation of the general contract's Section 4.5.1 into the subcontracts, Defendant specifically warranted that all work would be "free from faults and defects." These duties far exceed site inspection or plan review.
 
 
 17
 In Green Construction Co. v. Kansas Power & Light Co., the United States Court of Appeals for the Tenth Circuit, applying Kansas law, confronted an issue similar to that before us. 1 F.3d 1005 (10th Cir.1993). Green contracted to build a earthen dam for Kansas Power & Light ("KPL") out of clay soil found at the construction site. KPL provided geological data on the site's subsurface conditions, but expressly instructed bidders to investigate these conditions independently. Green failed to investigate independently, built the dam, and sued for excessive costs after the dam cracked and required repair. The Tenth Circuit affirmed the district court's holding that Green could not rely on the implied warranty of specification because the contract expressly allocated to Green the risk that the conditions could be different. Id. at 1009. Green's reliance on KPL's specifications alone was unreasonable in light of KPL's requiring Green to conduct an independent investigation of the subsurface conditions.
 
 
 18
 It is true that here, Defendant had virtually no discretion in carrying out its contractual obligations in light of the exacting specifications in the subcontracts. But it is also true that Defendant entered into subcontracts that require it to remove and to replace any defective materials "at its own cost and expense." We conclude that the implied warranty by Plaintiff based on the specifications of the type and manufacturer of the spandrel glass must yield to Defendant's express warranties against defective materials. In consequence, the district court erred in granting Defendant's motion for judgment as a matter of law.
 
 IV.
 
 19
 In its motion for judgment as a matter of law, Defendant moved alternatively for a new trial pursuant to Federal Rules of Civil Procedure 50(b) and 59. The district court dismissed Defendant's new trial motion as moot. Our reversal of the district court's order granting judgment as a matter of law for Defendant necessitates consideration of Defendant's new trial motion. Thus, the motion is not moot.
 
 
 20
 When granting a motion for judgment as a matter of law, the district court also is required to rule conditionally on any motion for a new trial. Fed.R.Civ.P. 50(c)(1). The court must determine whether the motion for a new trial should be granted or denied if the judgment is thereafter vacated or reversed. The court also must specify the grounds for its conditional ruling. Id. The district court's dismissal of the new trial motion as moot does not satisfy the rule's conditional ruling requirement. Thus, we are left with no record and, indeed, no guidance from the parties' briefs on appeal as to the merits of Defendant's new trial motion.[5]
 
 
 21
 In past cases in which the district court failed to issue the conditional ruling required by Federal Rule of Civil Procedure 50(c)(1), we have presumed that the court conditionally granted the motion for a new trial. Motter v. Everest & Jennings, Inc., 883 F.2d 1223, 1229 (3d Cir.1989); Roebuck v. Drexel Univ., 852 F.2d 715, 735 (3d Cir.1988). Those cases are not helpful here, however. In Motter, the district court mentioned in its opinion that it would grant the new trial motion conditionally, but did not rule on it in its order. Motter, 883 F.2d at 1229. In Roebuck, the district court omitted from its opinion any discussion of the new trial motion, but nonetheless granted it in its order. Roebuck, 852 F.2d at 735. In the case at bar, the district court did not discuss in its opinion whether it would conditionally grant or deny the new trial motion. Instead, in its order, the district court simply dismissed the new trial motion as moot.
 
 
 22
 In arguing in the alternative for a new trial before the district court, Defendant asserted two points of error. First, Defendant argued that Plaintiff's expert's testimony concerning the defective nature of the installed glass was improperly admitted. Second, Defendant argued that the jury was improperly instructed as to its ability to find Defendant liable for defects in the glass despite the implied warranty of specification.
 
 
 23
 We note that the propriety of our disposing of this motion in the first instance is not totally free from doubt. Compare 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2539, at 364 (2d ed. 1995) (stating that an appellate court must remand), with 5A James Wm. Moore et al., Moore's Federal Practice p 50.14, at 50-120 (2d ed. 1996) (stating that an appellate court may dispose of the motion or remand). Based on the grounds raised in the new trial motion and our lack of any trial record or argument before this court on the issue, we conclude that prudence militates in favor of a remand so that the district court may consider this issue.
 
 V.
 
 24
 For the foregoing reasons we will reverse the order of the district court entering judgment as a matter of law for Defendant and will remand for resolution of Defendant's motion for a new trial.
 
 
 25
 McKEE, Circuit Judge, dissenting.
 
 
 26
 I must respectfully dissent. I do not agree that this case is governed by United States v. Spearin, 248 U.S. 132, 54 Ct.Cl. 187, 39 S.Ct. 59, 63 L.Ed. 166 (1918), and its progeny, and, to the extent that the Spearin doctrine does assist us, I believe it requires that we affirm the district court. This case raises a state law issue, and, because the Pennsylvania courts have not expressly adopted Spearin,[1] this case is more appropriately analyzed under Filbert v. City of Philadelphia, 181 Pa. 530, 37 A. 545 (Pa.1897), and its progeny.
 
 I.
 
 27
 In Filbert, the plaintiffs contracted to build a reservoir for the City of Philadelphia. The contract provided that "the materials shall be furnished and the work performed 'in strict and exact accordance with the plan on file in the department of public works and the specifications hereto attached.' " Id. at 544, 37 A. 545. Those specifications detailed the amount of excavation and the precise materials to be used by the contractor. The contract also provided that the contractors agree to perform "all work necessary to make a complete and perfect reservoir ready for use." Id. (emphasis added). After it was completed, the reservoir began to leak, and the city tried to rely on this warranty clause to hold the contractors responsible for the leakage. The Supreme Court of Pennsylvania held that the city could not because this apparent guarantee to deliver a "complete and perfect reservoir" had to be read in the context of Filbert's specific undertaking.
 
 
 28
 The words, 'all work necessary to make a complete and perfect reservoir, ready for use,' ... when read in connection with other parts of the agreement, do not indicate an intention that the contractors were to be responsible for the result if there was no default on their part.
 
 
 29
 Id. 37 A. at 546 (emphasis added). The court added that
 
 
 30
 [t]his defect in the reservoir was not due to defective material or workmanship in its construction. To hold the [contractor] answerable for it would be to hold them as warranting that the reservoir should be a perfect reservoir, notwithstanding that its defects might be due entirely to its site or to the specifications. This is precisely the position taken by the city, and it cannot be sustained. The contract does not admit of such a construction.... [T]he contractors were bound to build as directed. The words 'all work necessary,' etc., ... were doubtless intended to cover points of construction which might have been overlooked.... The contractors were given no discretion. Every line was drawn, every grade was fixed, and every detail was provided for by the city.... We cannot conclude that ... it was intended that the contractors should do more than make a reservoir complete and perfect according to the plans and specifications furnished.
 
 
 31
 Id. 37 A. at 545-46. The parties here are in exactly the same position, and the district court realized that, notwithstanding the jury's verdict, the law requires a similar result.
 
 
 32
 Likewise, in Bush v. Jones, 144 F. 942 (3d Cir.1906), this Court held that the kind of general guarantee that the city had relied upon in Filbert (and that Turner relies upon here) did not make the contractors liable for a defect in a cellar they had contracted to build. There, the contract dictated precise specifications for the concrete work and waterproofing and stated: "The whole [was] to be made perfectly water-tight and guaranteed." Id. at 943. In fact, the completed cellar leaked. The owner tried to invoke the warranty to hold the contractors liable for the leak. This Court held that the express guarantee of a "perfectly water-tight" cellar must be interpreted in the context of the precise specifications in the contract.
 
 
 33
 The guaranty was not absolute, but qualified. It extended to their own work only, and only so far as this was involved, to the result. The specifications, which were the work of the architect, and for which they could not be expected to assume responsibility, directed how the work should be done, and by this they were controlled.... The owner having assumed to say by the specifications what was to be done, the contractors were relieved so far as they complied therewith. They guarantied, not the sufficiency of this to produce the desired result, but merely the effectiveness of what they themselves did under it.
 
 
 34
 Id. at 944 (emphasis added).
 
 
 35
 A more recent Pennsylvania case involving this issue is C.J. Langenfelder & Son, Inc. v. Commonwealth of Pennsylvania, 44 Pa.Cmwlth. 585, 404 A.2d 745 (1979). Although that case involved judicial review of an award by the Board of Claims and concerned liability for construction delays as opposed to a defect in contract specifications, it is of some assistance to us as it also demonstrates the reluctance of Pennsylvania courts to hold subcontractors under specification contracts liable for circumstances beyond their own control. There, Langenfelder contracted with the Pennsylvania Department of Transportation to construct 13,205 feet of highway and bridges within twenty-one months. Defects in the concrete used on the bridge deck delayed completion of the construction. Langenfelder filed a claim with the Board of Arbitration of Claims for the costs associated with this delay. After a hearing, the Board determined that the "concrete problem was caused by 'an adverse interaction between the initial brand of cement and the other add mixtures in the mix' " and that this problem was attributable to the Department: "This original mix design or formula was developed by the concrete supplier, who was chosen by Langenfelder from a list of suppliers provided by the Department. The mix design and all the ingredients used in it were tested and approved by the Department." Id. at 751 (emphasis added). The Board then awarded judgment in favor of Langenfelder, and both parties appealed. The Pennsylvania Commonwealth Court affirmed the Board's decision reasoning that "[w]hen the Department seeks to exert such close control over the source, the formulation and the production of material to be used in a construction project, it cannot disclaim responsibility for delays caused by a defect in that material." Id. (emphasis added).
 
 
 36
 Likewise, because Turner exerted such control over the source of the glass panels installed in the curtainwall, it cannot disclaim responsibility for their defects. The subcontract required Newman to install glass panels manufactured by one of three "approved" manufacturers; no substitutions were permitted. Newman selected one of these manufacturers and then submitted glass samples for approval as required under the contract. Thus, Newman complied with all of the specifications related to the type of glass installed in the curtainwall and ought not to be liable for the defects in that glass that were beyond its control.
 
 II.
 
 37
 The result we reach today is not only inconsistent with the sparse precedent that does control, as explained in Part I, supra, but is also inconsistent with the Supreme Court's ruling in Spearin. There, the contractor undertook to construct a drydock in accordance with detailed plans and specifications furnished by the U.S. Navy. However, before the work could begin it was necessary to relocate an existing section of sewer. "The plans and specifications provided that the contractor should do the work and prescribed the dimensions, material and location of the section to be substituted." Spearin, 248 U.S. at 133-34, 39 S.Ct. at 60. Spearin, the contractor, complied with those plans and specifications and relocated the sewer, and the substituted section was accepted by the Navy as satisfactory. A year later, however, heavy rains that coincided with high tide caused the sewer to rupture and flood the drydock excavation. Government officials and others knew that the site selected for the drydock had a history of flooding, but Spearin had not been informed of that. Spearin had merely made a "superficial examination" of the site prior to entering the contract but had not conducted a "special examination" nor made a "special inquiry" into the possibility of flooding. Id. at 134, 39 S.Ct. at 60. The contract that Spearin and the government entered into did have a clause requiring Spearin to inspect the site. After the drydock excavation flooded, the government refused payment, and Spearin sued to recover the balance owing under the contract.
 
 
 38
 In deciding the case, the Court first noted the general principle that "unforeseen difficulties" generally do not excuse the performance of one who has agreed to perform "a thing possible to be performed" for a fixed sum. Id. at 136, 39 S.Ct. at 61. The Court noted, however, that "if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." Id. Furthermore, the owner's responsibility is not defeated by "the usual clauses requiring builders to visit the site, to check the plans, and to inform themselves of the requirements of the work." Id.
 
 
 39
 Over the years, the courts have modified the Spearin doctrine. The modern approach to Spearin assigns responsibility for a defective specification according to whether it is a performance or design specification. See Kevin C. Golden & James W. Thomas, The Spearin Doctrine: The False Dichotomy Between Design and Performance Specifications, 25 Pub.Cont.L.J. 47 (1995). "Performance" specifications "set forth an objective or standard to be achieved, and the [subcontractor] is expected to exercise [its] ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection." Blake Constr. Co. v. United States, 987 F.2d 743, 745 (Fed. Cir.1993).
 
 
 40
 In contrast, "design" specifications "describe in precise detail the materials to be employed and the manner in which the work is to be performed. The [sub]contractor has no discretion to deviate from the specifications, but is 'required to follow them as one would a road map.' " Id. at 745 (emphasis added); Stuyvesant Dredging Co. v. United States, 834 F.2d 1576, 1582 (Fed.Cir.1987) (same); see also Aircraft Gear Corp. v. Kaman Aerospace Corp., 856 F.Supp. 446, 452 (N.D.Ill.1994) (Design specifications "set forth precise measurements, tolerances, materials, in process and finished product tests, quality control, inspection requirements, and other specific information."). This case clearly involves the latter type of specification.
 
 
 41
 Under the contracts before us, Newman agreed to install 1/4 inch spandrel glass panels that were heat strengthened and coated with a black polyethylene opacifier in the structural components of the building and over sections not visible from the exterior. Both subcontracts specifically provided that Newman had to use one of three "approved" glass manufacturers and that no substitutions were permitted. These provisions left Newman with no discretion to determine the materials used in the curtainwalls. The majority acknowledges as much. See Majority Op. at 6-7 ("It is true that here, Defendant had virtually no discretion in carrying out its contractual obligations in light of the exacting specifications in the subcontracts.").
 
 
 42
 Because a design specification is at issue here, under the modern approach to Spearin, Newman should not be liable for any defects in the materials as long as it complied with the specifications. The evidence presented to the jury established that Newman did comply with the subcontracts' provisions relating to the type of glass used in the curtainwall. Newman hired Spectrum, one of the three "approved" manufacturers, to provide the glass panels used in the curtainwall. As required under the subcontract, each panel was a 1/4 inch thick and treated with a black polyethylene opacifier. Moreover, although Turner now complains of latent defects in the glass that Newman installed, Turner inspected and approved glass samples that Newman provided prior to installation, as required under this contract.
 
 
 43
 The subcontract did not require Newman to do more than it did with respect to the glass panels. Therefore, Newman is not liable for the latent defect they contained. This defect caused the opacifier to separate from the glass after installation because the glue used to attach the opacifier to the glass became "tacky" under the temperatures in the curtainwall. However, because that defect related to the particular glass used--which Turner specified--and not how it was installed, the defect was within the implied warranty of the specifications.
 
 III.
 
 44
 It is beyond dispute that the terms of this contract were dictated by Turner. Turner included very precise specifications as to materials and could easily have included a provision stating that the subcontractor remained liable for any and all latent defects in materials supplied even though said materials otherwise conformed to the requirements of the contract. No such terms were included and I do not think that Turner can now have this Court so amend the contract by holding Newman liable for latent defects that have nothing to do with its performance.
 
 
 45
 The majority disagrees. It believes that "the implied warranty by [Turner] based on the specifications of the type and manufacturer of the spandrel glass must yield to [Newman's] express warranties against defective materials." Majority Op. at 698. The majority then likens this case to Green Construction Co. v. Kansas Power & Light Co., 1 F.3d 1005 (10th Cir.1993). I believe that Green is easily distinguished from the case here.
 
 
 46
 In Green, the contractor attempted to rely on the implied warranty of specifications to recover additional costs incurred when the dam it contracted to build cracked. The Kansas Power & Light Co. ("KPL") had provided bidders with information about the moisture content of the construction site's soil but instructed them to do an independent survey "as there would be no future adjustments in price for unforeseen conditions." Id. at 1007. However, contrary to the language of the contract, Green relied exclusively on the provided information and did not do an independent investigation, and, as a result, the finished dam leaked because the soil's moisture content was greater than KPL had reported. Nevertheless, Green argued that this express provision did not abrogate the implied warranty of the specifications. The Tenth Circuit disagreed: "An owner does not create an implied warranty by providing some soil information but instructing the contractor that the information may not be complete and that an independent site and soil investigation is required." Id. at 1009.
 
 
 47
 Had the contract provisions in this case required Newman to select a suitable glass based on its investigation of the site, the majority's reliance on Green would be appropriate. However, they did not. Instead, the contract before us contains provisions generally warranting that the work would be of good quality and free from defects, but that, if there were, Newman would replace them. I have two problems with allowing that language to determine the outcome here. First, such warranties are mere contract boilerplates, and hardly represent the kind of individualized express warranty the majority claims. See, e.g., Garden City Osteopathic Hosp. v. HBE Corp., 55 F.3d 1126 (6th Cir.1995)(involving contract containing provision similar to Section X of Newman's contract)(replacement of defective materials); Trustees of Indiana Univ. v. Aetna Cas. & Sur. Co., 920 F.2d 429 (7th Cir.1990)(same); Midwest Precision Servs., Inc. v. PTM Indus. Corp., 887 F.2d 1128 (1st Cir.1989)(same); Aiken County v. BSP Div. of Envirotech Corp., 866 F.2d 661 (4th Cir.1989)(same); Weyher/Livsey Constructors, Inc. v. International Chem. Co., 864 F.2d 130 (11th Cir.1989)(same); Sunstream Jet Express, Inc. v. International Air Serv. Co., 734 F.2d 1258 (7th Cir.1984)(same); Continental Air Lines, Inc. v. Wagner-Morehouse, Inc., 401 F.2d 23 (7th Cir.1968)(same); see also, e.g., Waukesha Foundry, Inc. v. Industrial Eng'g, Inc., 91 F.3d 1002 (7th Cir.1996) (involving contract containing provision similar to Section 4.5 of the general contract in the instant case) (work of good quality and free from faults and defects); Occidental Chem. Corp. v. Elliott Turbomachinery Co., 84 F.3d 172 (5th Cir.1996)(same); Leon's Bakery, Inc. v. Grinnell Corp., 990 F.2d 44 (2d Cir.1993)(same); Prentiss & Carlisle Co. v. Koehring-Waterous Div. of Timberjack, Inc., 972 F.2d 6 (1st Cir.1992)(same); Kritikos v. Palmer Johnson, Inc., 821 F.2d 418 (7th Cir.1987) (same). In contrast, the express warranty in Green was particular to that contract and unambiguously allocated the risk of defects in the specifications to the contractor. Therefore, it made sense in that case for the express warranty to abrogate the implied warranty of the specifications.
 
 
 48
 Second, the express warranties in this case are not unlike the general guarantee in Filbert which the Pennsylvania Supreme Court held did not, when read in conjunction with the other provisions of the contract, "indicate an intention that the contractors were to be responsible for the result if there was no default on their part." Filbert, 181 Pa. at 546, 37 A. 545. There is no evidence that Newman did not follow the specifications provided and thus it should not be liable because those specifications produced an unsatisfactory result.
 
 
 49
 Accordingly, I conclude that Newman was entitled to judgment as a matter of law and therefore would affirm the district court's order.
 
 
 50
 Present: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, LEWIS, McKEE, and SEITZ,* Circuit Judges.
 
 SUR PETITION FOR REHEARING
 June 4, 1997
 
 51
 The petition for rehearing filed by appellee in the above-entitled case having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the Court in banc, the petition for rehearing is denied.
 
 
 
 [1]
 Section X of the subcontracts specifies, in pertinent part:
 The Subcontractor shall ... take down all portions of the Work and remove from the premises all materials ... which the Architect or Turner [Plaintiff] shall condemn as unsound, defective or improper or as in any way failing to conform to this Agreement or the Plans, Specifications or other Contract Documents, and the Subcontractor, at its own cost and expense, shall replace the same with proper and satisfactory work and materials....
 (J.A. at 266.)
 
 
 [2]
 Section 4.5 of the general contract reads:
 
 
 [4]
 5 Warranty
 
 
 [4]
 5.1 The Contractor [Turner] warrants to the Owner and the Architect ... that all Work would be of good quality, free from faults and defects and in conformance with the Contract Documents
 (J.A. at 262.)
 
 
 [3]
 We agree with the district court that it is uncontroverted that the glue used to attach the opacifier coating to the glass was defective, thus causing the delamination that rendered the glass defective
 
 
 [4]
 At least one set of commentators has opined that this implied warranty "is necessary because even the most exhaustive government contracts generally do not expressly allocate the risk of loss for defective contract specifications." Kevin C. Golden & James W. Thomas, The Spearin Doctrine: The False Dichotomy Between Design and Performance Specifications, 25 Pub Cont. L.J. 47, 48 n. 3 (1995)
 
 
 [5]
 No challenge is made to our consideration of this issue, despite Defendant's failure to allege error with the district court's disposition of the new trial motion either in its brief or at oral argument. Cf. Scott v. Plante, 641 F.2d 117, 136 (3d Cir.1981), vacated on other grounds, 458 U.S. 1101, 102 S.Ct. 3474, 73 L.Ed.2d 1362 (1982)
 
 
 [1]
 The most recent Pennsylvania case on this issue, Stabler Construction, Inc. v. Commonwealth, 692 A.2d 1150, (Pa.Commw.Ct.1997), confirms this. In Stabler, a case also involving a private contract, the court noted that
 Spearin involved a contract with an agency of the federal government, and the Spearin Court determined the rights and obligations of the parties to that contract by applying federal law. The instant case does not involve or require the application of federal law. Therefore, Spearin is not binding on this court.
 Id., 692 A.2d at 1153 (emphasis added).
 
 
 *
 As to panel rehearing only