

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-8-2008

# Aquatrol Corp v. Altoona City Auth

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-3192

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Aquatrol Corp v. Altoona City Auth" (2008). *2008 Decisions.* Paper 393.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/393

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No.  07-3192
_____

AQUATROL CORPORATION,

Appellant,

v.

ALTOONA CITY AUTHORITY; G.M. MCCROSSIN, INC.,

Appellees.


_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 03-cv-00252)
District Judge: Honorable Kim R. Gibson
_____

Submitted Under Third Circuit LAR 34.1(a)
October 2, 2008

Before: FISHER, CHAGARES and HARDIMAN , *Circuit Judges*.

(Filed: October 8, 2008 )


_____

OPINION OF THE COURT
_____

HARDIMAN, *Circuit Judge*.

Aquatrol Corporation (Aquatrol) appeals an order of the District Court granting Defendants' Rule 50 motions on Aquatrol's breach of contract and promissory estoppel claims. The District Court had jurisdiction pursuant to 28 U.S.C. § 1332 and we have appellate jurisdiction pursuant to 28 U.S.C. § 1291.[1] We will affirm.

## I.

Because we write for the parties, we recount only those facts essential to our decision.

In 1998, the Altoona City Authority (the Authority) contracted with G.M. McCrossin (McCrossin) to manage the computer upgrade of the Horseshoe Curve Water Treatment Facility Project (the Project). The scope of the work included updating the software utilized by the Authority to make the computer systems at five water treatment plants Y2K-compliant. The contract (Contract) specified that McCrossin hire Aquatrol to complete the upgrade. Aquatrol had installed the previous software manufactured by Wonderware.

---

[1] Appellees Altoona City Authority and G.M. McCrossin contest our jurisdiction because the contract at issue contains specific dispute resolution procedures that Aquatrol did not invoke. Because Defendants first raised this argument after two and a half years of litigation and a jury trial, we deem this argument waived. *See Metro. Life Ins. Co. v. Price*, 501 F.3d 271, 278 (3d Cir. 2007) (the exhaustion requirement is not jurisdictional and may be waived); *see also Hoxworth v. Blinder, Robinson & Co.,* 980 F.2d 912, 925-26 (3d Cir. 1992) (refusing to uphold an arbitration agreement because the defendants "actively litigat[ed]" the case for eleven months before moving to arbitrate).

In March 1999, McCrossin executed a Purchase Agreement (Agreement) with Aquatrol for the installation and configuration of Y2K-compliant software. The purchase order incorporated specifications for the software upgrade and required that the work be completed by September 1, 1999. The specifications were created by Gwin, Dobson & Foreman, Inc. (GD&F), the Authority's consulting engineers. McCrossin agreed to pay Aquatrol $140,849.00 if the upgrade was completed satisfactorily. McCrossin also reserved the right to cancel the order if it was not completed as specified.

The software installation was not completed as specified. The first attempt by Aquatrol to install updated software was not made until December 1999 – three months after the initial project deadline. Moreover, neither GD&F nor the Authority was satisfied with the update because, *inter alia*, the software was still not Y2K-compliant. In order to prevent the loss of essential data, the water treatment plant computers needed to be set to a date prior to 2000, but all post-1999 dates could only be entered manually. On January 7, 2000, Aquatrol received a memo identifying the continuing failures in the software upgrade. Aquatrol responded to GD&F that the problems were caused by the Wonderware software that was used for the upgrade. On March 16, 2000, GD&F sent Aquatrol a letter informing it that the Authority remained displeased with the software upgrade and stated that payment would not be made until Aquatrol completed the upgrade as specified.

Problems with the upgrade continued. On December 12, 2000, Aquatrol sent the Authority a letter requesting that it agree to equipment upgrades to make the Wonderware software work properly. Aquatrol informed the Authority that the upgrades would add $53,000.00 to the price of the contract. The Authority responded that it would agree to Aquatrol's proposal but would not pay for the labor and expenses associated with the new installations. Aquatrol rejected this counterproposal.

On April 24, 2001, McCrossin sent Aquatrol a letter informing it that the Authority issued a "deduct change" for the Aquatrol contract. Accordingly, McCrossin requested that Aquatrol retrieve any equipment from the Project site. McCrossin sent Aquatrol a final order cancelling the Agreement in its entirety on May 23, 2001.

Four months later, Aquatrol contacted the Authority with a new offer. Based on its understanding of the Wonderware software settings, Aquatrol offered to complete the Project for the original contract price of $140,849.00. The Authority rejected this offer and eventually contracted with U.S. Filter Control Systems to complete the upgrade.

## II.

Aquatrol brought a breach of contract claim against McCrossin and unjust enrichment and promissory estoppel claims against the Authority. Following Aquatrol's case in chief, the District Court granted Defendants' motions for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure.

4

We exercise plenary review over a district court's decision to grant a motion for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 88 (3d Cir. 2000). "[A] directed verdict is mandated where the facts and the law will reasonably support only one conclusion." *Id.* (quoting *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 356 (1991)). In our review, we "must draw all reasonable inferences in favor of the nonmoving party." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

### III.

Aquatrol first argues that the District Court erred in granting McCrossin judgment as a matter of law on Aquatrol's breach of contract claim. Aquatrol asserts that McCrossin breached the Agreement when it failed to pay after Aquatrol performed the software upgrade in conformity with all applicable specifications.

Although Aquatrol admits that the Wonderware software was not working properly at the time that the contract was cancelled in 2001,[2] it asserts that the "problems were due to bugs in the Wonderware software selected by GD&F." Aquatrol claims that

---

[2] The original deadline for completion of the Agreement was September 1, 1999. Although McCrossin did not terminate the Agreement on September 2, 1999, it was within its rights to terminate for nonperformance at that time. Nevertheless, McCrossin gave Aquatrol an opportunity to complete performance. Despite this additional time, Aquatrol failed to perform as specified in the Agreement and McCrossin was forced to terminate the Agreement in May 2001 – 21 months after the deadline specified in the Agreement.

it satisfied its obligations under the Agreement because it "supplied and installed the Wonderware software as specified in the purchase order (incorporating the specification)." We disagree.

Pennsylvania law states that a contractor or subcontractor, such as Aquatrol, is not responsible for defects caused by problems in a *design* specification. *See A.G. Cullen Constr. Inc. v. State Sys. of Higher Ed.*, 898 A.2d 1145, 1156 (Pa. Commw. Ct. 2006); *Rhone Poulenc Rorer Pharms., Inc. v. Newman Glass Works*, 112 F.3d 695 (3d Cir. 1997). *See generally United States v. Spearin*, 248 U.S. 132 (1918) (providing guidance on the doctrine of implied warranty of design). Design specifications "describe in precise detail the materials to be employed and the manner in which the work is to be performed. The contractor has no discretion to deviate from the specifications, but is required to follow them as one would a road map." *A.G. Cullen*, 898 A.2d at 1156. In contrast, *performance* specifications "set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection." *Id*. In addition, where a specification "identifies a particular product or manufacturer by name, but permits substitution of 'an approved equal,' such a specification is 'performance' in nature and, as a result, carries no implied warranty." *Id.*

6

The Agreement between McCrossin and Aquatrol, and the specifications incorporated into that Agreement, demonstrate that the software upgrade was a performance specification. Aquatrol was hired to ensure that the "existing treatment plants which are utilizing Aquatrol Equipment shall be upgraded with required software and programming to make systems fully year 2000 compliant." Although the specifications directed Aquatrol to "[p]rovide updated [W]onderware software for each plant," they also made clear that Aquatrol retained the discretion to substitute another software product or a different version of Wonderware. The Standard General Conditions, as incorporated into the Contract, stated:

> Whenever an item of material or equipment is specified or described in the Contract Documents by using the name of a proprietary item or the name of a particular Supplier, the specification or description is intended to establish the type, function and quality required. Unless the specification or description contains or is followed by words reading that no like, equivalent or 'or-equal' item or no substitution is permitted, other items of material or equipment or material or equipment of other Suppliers may be accepted by ENGINEER ...

Accordingly, the specifications clearly stated an objective — Y2K compliance — but left the manner of accomplishing that objective to the discretion of Aquatrol. Aquatrol had the freedom to either update the pre-existing Wonderware software however it saw fit, or else choose a substitute software product of the same type, function, and quality. In sum, because the Agreement included *performance* specifications, McCrossin cannot be held

responsible under Pennsylvania law for providing Aquatrol with defective design specifications.[3]

Because Aquatrol failed to successfully update the Project's software as required by the Agreement, we conclude that the District Court did not err in granting McCrossin's motion for judgment as a matter of law on Aquatrol's breach of contract claim.

**IV.**

Aquatrol next argues that the District Court erred in granting the Authority's motion for judgment as a matter of law on Aquatrol's promissory estoppel claim.

To recover under a claim for promissory estoppel, Aquatrol must prove that: (1) the Authority made a promise that it should have reasonably expected would induce action or forbearance on the part of Aquatrol; (2) Aquatrol took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by

---

[3] Even if the *Spearin* doctrine did apply, Aquatrol could not show a defect in the specification requiring the use of Wonderware software. Aquatrol admitted that the problems occurred because it needed to change two settings in the updated Wonderware software. The Wonderware software, therefore, was suitable for the Project and the specifications were free from defects. No liability, therefore, can be assigned to McCrossin by virtue of a defect in design. *See Dep't of Transp. v. W. P. Dickerson & Son, Inc.*, 400 A.2d 930, 362-64 (Pa. Commw. Ct. 1979). Moreover, Aquatrol was bound by the express warranties against defective work contained in the Contract. Aquatrol warranted and guaranteed that all work "will not be defective" and agreed to "pay all claims, costs, losses, and damages caused by or resulting from such correction or removal (including but not limited to all costs of repair or replacement of work of others)." Any implied warranties of design "must yield to [the] express warranties against defective materials." *Rhone Poulenc*, 112 F.3d at 698.

enforcing the promise. *Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710, 717-18 (Pa. Super. Ct. 2005).

Aquatrol asserts that the Authority promised: if "you finish the job you're going to get paid." Without deciding whether the Authority's statements to Aquatrol constituted a promise sufficient to support a claim for promissory estoppel, we hold that Aquatrol cannot prevail on its promissory estoppel claim for work it did pursuant to a contract. *Calson v. Arnot-Ogden Mem'l Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990). Indeed, any action that Aquatrol took was already covered by its Agreement with McCrossin. Aquatrol's President, Jim McDermott, testified that he understood from the Authority that if Aquatrol completed the job, it would get paid the original contract price. But when asked if it was true that "[n]one of these so-called encouragements were to do anything else other than complete the job that you had contracted to do," McDermott responded, "[t]hat's correct."

In the event that Aquatrol alleges that it took action in reliance on promises made by the Authority after Aquatrol's Agreement with McCrossin terminated on May 23, 2001, we hold that Aquatrol acted on its own will. When a party acts on its own will and not as a result of any representation made by another, a claim for promissory estoppel must fail. *Ravin, Inc. v. First City, Co.*, 692 A.2d 577, 581 (Pa. Super. Ct. 1997). Aquatrol has done no more than show that McDermott was in contact with the Authority between May and October of 2001. At trial, McDermott admitted: "I don't have any

9

dates and I didn't make any notes on phone calls, they were just cordial phone calls that were made — how are you doing, you know, when are you coming back, some time in the June to the following September of '01 period." McDermott later clarified that "there may have been phone calls in between" March and October 2001, but he does not have any evidence of these phone calls and cannot say that he talked to anybody in particular.

Moreover, contrary to Aquatrol's current assertion that it was relying on a promise by the Authority to pay for any continuing work on the upgrade project, we note that Aquatrol attempted to contract with the Authority to finally resolve the Wonderware software problems on October 1, 2001. In that proposal, Aquatrol stated: "[w]e would like to inquire if the Altoona Water Authority would like us to return and complete the upgrade of your 5 Aquatrol systems. . . . In return we would receive compensation in the original amount of $140,849.00." This offer was rejected by the Authority. Accordingly, while Aquatrol and the Authority may have been engaged in continuing discussions about the Project, Aquatrol failed to identify any specific promise made by the Authority sufficient to support a claim for promissory estoppel.

For the foregoing reasons, we will affirm the judgment of the District Court.